RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0114p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RANDY D. PEARCE,

                      *Plaintiff-Appellant*,

    *v.*

CHRYSLER GROUP LLC PENSION PLAN,

                      *Defendant-Appellee*.

No. 17-1431

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-14720—Sean F. Cox, District Judge.

Argued: May 4, 2018

Decided and Filed: June 20, 2018

Before: MOORE, THAPAR, and BUSH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Lawrence J. Breskin, Detroit, Michigan, for Appellant. William E. Altman, THE MURRAY LAW GROUP, P.C., Bingham Farms, Michigan, for Appellee. Eirik Cheverud, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Lawrence J. Breskin, Detroit, Michigan, for Appellant. William E. Altman, THE MURRAY LAW GROUP, P.C., Bingham Farms, Michigan, for Appellee. Eirik Cheverud, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Randy Pearce, a long-time employee of Chrysler Group LLC, was a participant in the Chrysler Group LLC Pension Plan ("Plan").

Under the Plan's terms, Pearce had earned an early retirement supplement, called "30-and-Out benefits." He relied on the Summary Plan Document ("SPD"), provided by Chrysler to Plan participants, which stated he did not need to be "actively employed at retirement" to remain eligible for these benefits. But the SPD omitted an exclusionary clause contained in the Plan document itself, which said that an employee who was terminated was ineligible for the early retirement supplement. After Pearce was terminated, he applied for his retirement benefits and was denied the 30-and-Out benefits.

After unsuccessfully appealing this denial administratively, Pearce brought suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Pearce seeks to hold the Plan to its representations in the SPD, notwithstanding the exclusionary provision in the Plan document, via the equitable remedies available under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). For the reasons set forth below, we **REVERSE** the district court's grant of summary judgment to the Plan on Pearce's request for reformation, **AFFIRM** summary judgment on Pearce's request for equitable estoppel, and **REMAND** for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURE

In October 2008, facing insolvency, Chrysler offered certain employees buyouts with incentives to take early retirement, in addition to the benefits they had already earned under the Plan. *Pearce v. Chrysler Grp., L.L.C. Pension Plan (Pearce I)*, 615 F. App'x 342, 343 (6th Cir. 2015); R. 89-4 (2008 Separation Incentive Ltr. at 1) (Page ID #3133). At the time of the buyout offer, Pearce was sixty years old and had worked for Chrysler for more than thirty-three years. *Pearce I*, 615 F. App'x at 343. This made him eligible for the buyout offer as well as the Plan's 30-and-Out benefits, which were a monthly pension supplement "designed to help early retirees make ends meet until eligible for Social Security benefits." *Id.*

"Chrysler provided Pearce with Pension Statements to help him decide whether to accept the buyout . . . ." *Id.* These statements repeatedly advised him to consult the SPD for further details about his benefits. R. 12-5 (All Plans Summary at 2) (Page ID #589); R. 12-5 (CPP Pension Estimate at 2) (Page ID #597); R. 12-5 (AMC Salary Plan Pension Estimate at 2) (Page

ID #603).  Although Pearce was directed multiple times to the SPD for further explanation of his benefits, the SPD twice cautioned its readers that "it is only a summary of Plan Provisions" and "[i]f there is a conflict between this summary and the Plan document and trust agreement, the Plan document and trust agreement will govern."  R. 12 (SPD at 2) (Page ID #116); *see also id.* at 29 (Page ID #143).

With respect to the Plan's 30-and-Out benefits, the SPD stated:  "You do not need to be actively employed at retirement to be eligible for a supplement.  However, you must retire and begin receiving pension benefits within five years of your last day of work for the Company in order to receive any supplements for which you are eligible."  *Id.* at 12 (Page ID #126).  Based on this explanation, Pearce believed that he could not lose his 30-and-Out benefits if he lost his job.  R. 89-6 (Pearce Dep. at 36) (Page ID #3158).

"[O]n November 25, 2008, after discussing the terms of the SPD and his likely future with other employees of Chrysler, Pearce declined the buyout offer."  *Pearce I*, 615 F. App'x at 343.  Chrysler terminated him that same day.[1]  "Pearce [then] applied to Chrysler's benefit manager, Benefit Express/Hewitt LCC ('Benefit Express'), for the pension benefits he had earned under the Pension Plan."  *Id.*; R. 12-5 (Benefit Express Customer Service Log) (Page ID #576).  Benefit Express informed Pearce that, because he had been terminated prior to his retirement, under the Plan's terms he was ineligible for the 30-and-Out benefits.[2]  R. 12-5 (Benefit Express Customer Service Log) (Page ID #581); R. 12 (Mar. 20, 2009 Ltr. at 1) (Page ID #105).  It provided Pearce another copy of the SPD for him to review.  R. 12 (Mar. 20, 2009 Ltr. at 2) (Page ID #106).  In response, Pearce asked Benefit Express to identify where in the SPD he could "find what you have stated and you have written."  R. 12 (Mar. 21, 2009 Email)

---

[1]This termination was the subject of separate age-discrimination claims filed by Pearce, which were settled in Chrysler's bankruptcy proceedings.  R. 16-4 (Pearce Age-Discrimination Claims) (Page ID #748–53); R. 16-5 (Bankr. Settlement) (Page ID #763–67).

[2]The Plan document states that "a Vested Terminated Participant who met the eligibility requirements for early retirement at the date his employment terminated shall *not* be eligible to receive an Early Retirement Supplement . . . ."  R. 12-3 (Plan Document at 40) (Page ID #426) (emphasis added).  The Plan defines a "Vested Terminated Participant" as "an individual whose employment with the Corporation ceased prior to the date he retired and who possessed a vested right to a Deferred Pension at the date of termination of his employment."  *Id.* at 8 (Page ID #394).

(Page ID #151).  "There is no indication in the record that Pearce received a response."  *Pearce I*, 615 F. App'x at 344.

In September 2009, Pearce filed a claim with Benefit Express's Determination Review Team pursuant to ERISA § 503, 29 U.S.C. § 1133, contesting the decision to deny him the 30-and-Out benefits.  R. 12 (Claim Initiation Form) (Page ID #158–63).  The Review Team affirmed the denial in March 2010.  R. 12 (Review Team Denial at 1) (Page ID #166).  Pearce appealed that decision to the Chrysler Employee Benefits Committee in May 2010.  R. 12-6 (Admin. Appeal) (Page ID #615–21).  The Committee failed to respond to Pearce's appeal.

Pearce then filed a complaint in Michigan state court asserting a claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); Chrysler removed the case to federal court.  R. 1 (Notice of Removal) (Page ID #9).  As the federal court proceedings progressed, the Committee belatedly denied Pearce's administrative appeal.  R. 12-6 (Mar. 29, 2011 Appeal Denial) (Page ID #658–60).  Because "this matter involve[d] both a procedural defect [the untimeliness of the administrative decision] and an incomplete record," the district court remanded Pearce's claim back to the Committee for reconsideration.  R. 30 (2012 Dist. Ct. Order at 4) (Page ID #1131).  The Committee reaffirmed the denial of Pearce's claim, stating that the provisions of the Plan document, not the SPD, controlled.  R. 36 (Sept. 20, 2012 Appeal Denial) (Page ID #1228).  Pearce moved the district court to reopen his federal case, which it did.  R. 31 (Pl. Mot. to Reopen) (Page ID #1133–39); R. 33 (Or. Granting Pl. Mot. to Reopen) (Page ID #1146).

During this time, the Supreme Court held that statements in summary documents "do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)" and therefore could not be enforced under this section.  *CIGNA Corp. v. Amara (Amara III)*, 563 U.S. 421, 438 (2011) (emphasis in the original).  But the Supreme Court stated that ERISA § 502(a)(3) empowered a court to provide equitable relief in a situation in which the beneficiaries had been provided false or misleading information about plan provisions.  *Id.* at 440–42.

After the district court reopened Pearce's federal case, he moved for leave to amend his complaint to add a request for equitable relief under ERISA § 502(a)(3).  R. 50 (Mot. to Amend) (Page ID #1559–63).  The parties also filed cross-motions for judgment on the record.  R. 60

(2013 Dist. Ct. Op. at 4) (Page ID #1845).  The district court granted judgment in favor of Chrysler and denied as futile Pearce's motion for leave to amend his complaint.  *Id.*  Pearce timely appealed.  R. 62 (Oct. 11, 2013 Notice of Appeal) (Page ID #1847–48).

A panel of this court "affirm[ed] the grant of summary judgment on Pearce's claim under ERISA § 502(a)(1); reverse[d] the denial of Pearce's motion to amend to add equitable claims under ERISA § 502(a)(3); and remand[ed] for consideration of the ERISA § 502(a)(3) claims." *Pearce I*, 615 F. App'x at 351.  The panel held that "it is clear that Pearce is not eligible for 30-and-Out benefits under terms of the Plan, and thus he cannot recover under ERISA § 502(a)(1)(B)."  *Id.* at 346 (citing *Amara III*, 563 U.S. at 438).  But we further held that there was "a conflict between the SPD and the Pension Plan . . . because the [SPD] misleads or fails to state additional requirements contained in the plan document."  *Id.* at 347 (alteration in original) (internal quotation marks omitted).  Because of "[t]his material conflict between the Pension Plan and the SPD," Pearce could "seek equitable relief under ERISA § 502(a)(3)."  *Id.* at 349.  Thus, his motion to amend his complaint to add a request for equitable relief under ERISA § 502(a)(3) was not futile.[3]  *Id.*

On remand, Pearce filed an amended complaint.  R. 68 (Amend. Compl.) (Page ID #1876–88).  In Count 1, Pearce sought equitable relief in the form of reformation, equitable estoppel, and surcharge under ERISA § 502(a)(3) for a violation of ERISA § 102(b), 29 U.S.C. § 1022(b).  *Id.* at 8–12 (Page ID #1883–87).  In Count 2, Pearce renewed his claim for relief under ERISA § 502(a)(1)(B).  *Id.* at 12 (Page ID #1887).  The parties then filed cross-motions for summary judgment.  R. 72 (Chrysler Mot. for SJ) (Page ID #1906–43); R. 73 (Pearce Mot. for SJ) (Page ID #2195–27).

The magistrate judge recommended that the district court deny Pearce's motion for summary judgment and grant Chrysler's motion for summary judgment, R. 87 (2017 R&R at 34–35) (Page ID #3047–48), and the district court adopted the magistrate judge's report and recommendation in full, R. 91 (2017 Dist. Ct. Op. at 10) (Page ID #3269).  The plaintiff timely

---

[3]The *Pearce I* panel "express[ed] no opinion on the merits of Pearce's ERISA § 502(a)(3) claims other than that they [were] not futile."  615 F. App'x at 349 n.7.

appealed the grant of summary judgment with respect to his request for equitable relief in the forms of reformation and equitable estoppel.  R. 93 (Apr. 12, 2017 Notice of Appeal) (Page ID #3271–72).

## II.  STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment.  *Med. Mut. of Ohio v. k. Amalia Enters., Inc.*, 548 F.3d 383, 389 (6th Cir. 2008).  Summary judgment is proper if, when drawing all inferences in the light most favorable to the non-moving party, the moving party "shows that there is no genuine dispute as to any material fact."  FED. R. CIV. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "[W]e may affirm the judgment on grounds other than those employed by the lower court, as long as the party opposing summary judgment is not denied the opportunity to respond."  *Med. Mut. of Ohio*, 548 F.3d at 389 (quoting *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 n.2 (6th Cir. 2008)).

## III.  ANALYSIS

### A.  The District Court's Review of the Magistrate Judge's Report and Recommendation

As a prefatory matter, Pearce argues that the district court applied the wrong standard of review to the magistrate judge's report and recommendations.  "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  FED. R. CIV. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1).  For an objection to be proper, Eastern District of Michigan Local Rule 72.1(d)(1) requires parties to "specify the part of the order, proposed findings, recommendations, or report to which [the party] objects" and to "state the basis for the objection."

In its decision, the district court articulated further restrictions on the type of objections it would consider:

> Objections are not "a second opportunity to present the argument already considered by the Magistrate Judge."  *Betancourt v. Ace Ins. Co. of Puerto Rico*, 313 F. Supp. 2d 32, 34 (D.P.R. 2004).  Moreover, the district court should not consider arguments that have not first been presented to the magistrate judge.  *See Stonecrest Partners, LLC v. Bank of Hampton Roads*, 770 F. Supp. 2d 778, 785 (E.D.N.C. 2011).

R. 91 (2017 Dist. Ct. Op. at 3) (Page ID #3262). Pearce rightfully complains that the district court's definition of what constitutes a proper objection creates a null set. A party can make no arguments supporting its objection under the district court's standard: Either the argument is prohibited because the party did previously make that argument, or it is prohibited because the party did not previously make that argument. The heads-I-win-tails-you-lose restrictions that the district court has imposed on objections are illogical and without legal support. *See McCombs v. Meijer, Inc.*, 395 F.3d 346, 360 (6th Cir. 2005) (holding that when a district court conducts a de novo review of a magistrate judge's report, "[t]he district court cannot simply 'concur' in the magistrate's findings, but it must conduct its own review in order to adopt the recommendations").

Chrysler argues that the district court did properly review de novo the magistrate judge's report and recommendation, notwithstanding the foregoing discussion, because it addressed each objection Pearce raised. A review of the district court's opinion shows that the district court does appear to have analyzed each of Pearce's objections on the merits. R. 91 (2017 Dist. Ct. Op. at 4–9) (Page ID #3263–68).

Because we review de novo the grant of summary judgment and the parties have briefed the underlying issues, we will squarely address the merits of this case, rather than reversing and remanding solely because the district court's own de novo review may have been compromised by its erroneously narrow restrictions on the arguments that parties could make. *Compare, e.g.*, *Jones v. Caruso*, 569 F.3d 258, 269–70 (6th Cir. 2009) (declining to reverse and remand a case, even though the district court applied the incorrect legal standard, because this court was in a position to decide the issue de novo), *with Price v. Bd. of Trs. of the Ind. Laborer's Pension Fund*, 632 F.3d 288, 298 (6th Cir. 2011) (reversing a grant of summary judgment and remanding because the district court applied the incorrect standard of review to the disputed administrative decision and neither party addressed the issue using the proper standard of review before the district court or this court).

## B.  Reformation

### 1.  Whether Reformation Sounds in Trust or Contract Law

The Supreme Court held that reformation is a form of equitable relief available to a plaintiff under § 502(a)(3).  *Amara III*, 563 U.S. at 440–41.  The Supreme Court did not, however, explicitly state whether reformation pursuant to ERISA sounds in trust or contract law.  *See Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1166–67 (9th Cir. 2012).  There is a meaningful difference between reformation in trust law and reformation in contract law.  In the law of trust, the court's analysis focuses mainly on the settlor's intent.  *Id.* at 1166.  In contrast, in the law of contract, the court considers the intent and actions of both parties.  *Id.*

The Second Circuit has held that reformation should be analyzed under principles of contract law because the Supreme Court "exclusively referred to principles of contract law, not trust law" in its discussion of reformation and, furthermore, the Restatement (Third) of Trusts "explains that trust reformation is dictated by principles of contract law '[w]here consideration is involved in the creation of a trust.'"  *Amara v. CIGNA Corp. (Amara V)*, 775 F.3d 510, 524 (2d Cir. 2014) (alteration in original) (quoting RESTATEMENT (THIRD) OF TRUSTS § 62 cmt. a (AM. LAW INST. 2003)).

We have not had occasion to decide specifically this issue before, but we have obliquely discussed reformation under § 502(a)(3) in the context of contract law.  *Alexander v. Bosch Auto. Sys., Inc.*, 232 F. App'x 491, 498–99 (6th Cir. 2007), *cert. denied*, 554 U.S. 932 (2008).  We need not definitively decide the question here.  In this case, the magistrate judge analyzed reformation utilizing the principles of contract law, and the parties have not objected to this portion of the magistrate judge's analysis here or below.  R. 87 (2017 R&R at 17) (Page ID #3030).  Thus, we will analyze Pearce's request for reformation in the context of contract law principles.

### 2.  What Constitutes Fraud or Inequitable Conduct

"Reformation is the judicial reforming or re-writing of a document, such as a contract, to make that document reflect the true agreement of the parties."  DAN B. DOBBS, LAW OF

REMEDIES § 9.4(1) (3d ed. 2018) [hereinafter DOBBS 3d]. "A contract may be reformed" in two situations: (1) where there is a "mutual mistake of both parties"; or (2) "where one party is mistaken and the other commits fraud or engages in inequitable conduct." *Amara V*, 775 F.3d at 525 (citing *Simmons Creek Coal Co. v. Doran*, 142 U.S. 417, 435 (1892)); *see also Conn. Fire Ins. Co. v. Oakley Improved Bldg. & Loan Co.*, 80 F.2d 717, 719 (6th Cir.) (The court's "jurisdiction to reform written instruments where there is a mistake on one side and inequitable conduct on the other is undoubted." (citing *Simmons Creek Coal Co.*, 142 U.S. at 435)), *cert. denied*, 298 U.S. 687 (1936). Pearce argues that the second situation occurred here: unilateral mistake coupled with wrongful conduct by the non-mistaken party. The parties do not dispute that Pearce was unilaterally mistaken about his eligibility for the 30-and-Out benefits. Rather, the crux of the parties' disagreement is whether Pearce has demonstrated that Chrysler engaged in either fraudulent or inequitable conduct. Pearce must do so by clear and convincing evidence. *See Amara V*, 775 F.3d at 526; *cf.* RESTATEMENT (SECOND) OF CONTRACTS § 155 cmt. c (AM. LAW INST. 1981).

The district court adopted the magistrate judge's conclusion that Pearce needed to prove Chrysler's intent to deceive in order to demonstrate either fraud or inequitable conduct. R. 91 (2017 Dist. Ct. Op. at 5) (Page ID #3264); R. 87 (2017 R&R at 20) (Page ID #3033). This is an incorrect statement of the law. Thus, we reverse the grant of summary judgment to the Plan—because it is premised on this erroneous interpretation of the law—and remand for the district court to analyze Pearce's entitlement to reformation under the proper legal framework, elucidated below.

"Fraud has a broader meaning in equity [than at law] and intention to defraud or to misrepresent is not a necessary element." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 193 (1963) (alteration in original) (footnote and internal quotation marks omitted); *see Amara V*, 775 F.3d at 526 (holding that equitable fraud "generally consists of obtaining an undue advantage by means of some act or omission which is unconscientious or a violation of good faith" (internal quotation marks omitted)). "Fraud . . . in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and

unconscientious advantage is taken of another." *Capital Gains Research Bureau, Inc.* 375 U.S. at 194 (footnote and internal quotation marks omitted).

This may all seem rather nebulous, but it is necessarily so because "[t]he essence of equity jurisdiction" is its "[f]lexibility rather than rigidity." *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). But we highlight some guideposts. First, whether a defendant had a "legal or equitable duty, trust, or confidence" is an important factor, although not dispositive. *Capital Gains Research Bureau, Inc.* 375 U.S. at 194 (internal quotation marks omitted). Here, Chrysler had a legal duty under ERISA § 102 to include the exclusion clause for vested terminated participants in the SPD, which duty it breached. *Pearce I*, 615 F. App'x at 349; ERISA § 102(b) ("The summary plan description shall contain . . . circumstances which may result in disqualification, ineligibility, or denial or loss of benefits . . . ."). Second, the defendant must have obtained "an undue and unconscientious advantage" or the plaintiff must have suffered an injury or both. *Capital Gains Research Bureau, Inc.* 375 U.S. at 194 (internal quotation marks omitted). On remand, the district court should analyze in the first instance the extent of injury suffered by Pearce arising from the denial of his 30-and-Out benefits, as well as any benefit Chrysler derived from the denial.

Third, reformation's requirement of fraud or inequitable conduct roughly mirrors the fraud element of equitable estoppel, and therefore fraud in the latter context provides some helpful factors to consider in the former. *Compare Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 431 (6th Cir. 2007) (holding, in an equitable estoppel case, that equitable fraud requires "either intended deception or such gross negligence as to amount to constructive fraud" (internal quotation marks omitted)), *with Capital Gains Research Bureau, Inc.* 375 U.S. at 194 (stating that equitable fraud "includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence," that cause an injury to another or an undue advantage to the wrongdoer), *and Amara V*, 775 F.3d at 526 (holding that equitable fraud arises from an "undue advantage" obtained through an unconscientious or bad faith "act or omission"); *cf. Guy v. Lexington-Fayette Urban Cty. Gov't*, 57 F. App'x 217, 224 (6th Cir. 2003) (holding that "constructive fraud is the 'breach of legal or equitable duty which, in spite of the fact that

there is no moral guilt resulting from the breach of duty, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.'" (quoting *Epstein v. United States*, 174 F.2d 754, 765–66 (6th Cir. 1949))).

We have typically found constructive fraud in the ERISA context when there is: (1) an information asymmetry, such that the defendant is the only one who knows the true facts and the plaintiff cannot ascertain the true facts; (2) the defendant misrepresents the benefits to which the plaintiff is entitled; and (3) the plaintiff investigated her benefits and drew a reasonable conclusion about them on the basis of the defendant's misrepresentations, even when the documents the plaintiff relied upon contained a disclaimer that the plan would govern in the event of a conflict. *Deschamps v. Bridgestone Americas, Inc. Salaried Emps. Ret. Plan*, 840 F.3d 267, 274–75 (6th Cir. 2016). Additionally, whether the defendant took actions to mitigate its misrepresentations and correct the plaintiff's misunderstanding is also relevant. Thus when an employer made an "honest mistake" and misinformed a beneficiary of her benefits, but then repeatedly sent correction letters in the ensuing months, the employer is not grossly negligent and therefore has not committed constructive fraud. *Id.*

These guideposts are exactly that: guides. They are not the only factors that are relevant, nor is any one dispositive. On remand, the district court should consider these guiding principles, but it retains the flexibility that is the central tenet of a court sitting in equity.

### 3. Whether the Fraud or Inequitable Conduct Must Arise in the Drafting of the Plan Document

There is one subsidiary issue that we take the time now to resolve. Chrysler argues, in the alternative, that any evidence of fraud or inequitable conduct is irrelevant to the drafting of the Plan, and thus the Plan cannot be reformed. Chrysler points to a Ninth Circuit decision, in which the court held that reformation was unavailable to the plaintiffs because: (1) the conflicting SPD was created after the plan; (2) there was no evidence that the defendant materially misled its employees; and (3), even if the defendant had done so, the plaintiffs "conceded that they did not rely on any of the misleading information." *Skinner*, 673 F.3d at 1166–67. This decision is easily distinguishable.

Here, Pearce did not have access to the Plan document and Chrysler, which had the advantage in the information asymmetry, consistently and repeatedly directed Pearce to the SPD. Thus, the basis of his mutual agreement with Chrysler was the SPD. DOBBS 3d, *supra*, § 9.4(1) (stating that reformation reforms the document to "reflect the true agreement of the parties"). Further, the SPD misleadingly omitted the exclusion for vested terminated participants, and Pearce relied upon the SPD to his detriment. Moreover, as the Plan's representative admitted, nobody expects Plan participants to read the Plan document or to understand it. R. 89-7 (Bante Dep. at 29) (Page ID #3166) ("The Plan Document is a log [sic] and complex legal document that is not intended for normal human beings to read.").

## C. Equitable Estoppel

To assert a claim for equitable estoppel under § 502(a)(3) successfully, a plaintiff must establish:

> (1) conduct or language amounting to a representation of material fact; (2) awareness of the true facts by the party to be estopped; (3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; (4) unawareness of the true facts by the party asserting the estoppel; and (5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Deschamps*, 840 F.3d at 273 (quoting *Bloemker v. Laborer's Local 265 Pension Fund*, 605 F.3d 436, 442 (6th Cir. 2010)). But, if the plaintiff is attempting to "invoke equitable estoppel in the case of unambiguous pension plan provisions," he must demonstrate three further elements: "[(6)] a written representation; [(7)] plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and [(8)] extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." *Bloemker*, 605 F.3d at 444. A showing of these three additional elements serves as a "narrow exception," *Donati v. Ford Motor Co., Gen. Ret. Plan, Ret. Comm.*, 821 F.3d 667, 675 (6th Cir. 2016), to the general rule that "estoppel can only be invoked in the context of ambiguous plan provisions." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 404 (6th Cir. 1998) (en banc).

The district court concluded that Pearce failed to satisfy these eight elements. R. 91 (2017 Dist. Ct. Op. at 5–6) (Page ID #3264–65). Pearce first argues that the district court erroneously required him to satisfy the three additional elements. Pearce's argument is logical. *Bloemker* imposed these extra requirements when the law of this court held that, in the case of a conflict between the SPD and the Plan, the SPD's provisions controlled. *See, e.g.*, *Haus v. Bechtel Jacobs Co.*, 491 F.3d 557, 565 (6th Cir. 2007), *abrogated in part by Amara III*, 563 U.S. 421. Thus, the three additional elements would not have applied to a case like this one. But Pearce's argument is foreclosed by our continued application of *Bloemker* after the Supreme Court decided *Amara*. *See Deschamps*, 840 F.3d at 273; *Donati*, 821 F.3d at 675; *Haviland v. Metro. Life Ins. Co.*, 730 F.3d 563, 569 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 1790 (2014); *Paul v. Detroit Edison Co. & Mich. Consol. Gas Co. Pension Plan*, 642 F. App'x 588, 593 (6th Cir. 2016).

Consequently, because the pertinent language in the Plan was unambiguous—Pearce was clearly not eligible under the Plan for the 30-and-Out benefits—a rational factfinder must be able to conclude that he satisfies each of the eight *Bloemker* elements in order for him to survive summary judgment on the equitable-estoppel theory. On appeal, Chrysler argues that Pearce cannot satisfy three of the eight required elements: (2) Chrysler's awareness of the true facts; (7) Pearce's inability to calculate his true benefits; and (8) extraordinary circumstances warranting equitable relief. Because we conclude that Pearce cannot show the seventh *Bloemker* element, we do not consider the parties' arguments with respect to the second and eighth elements.

Pearce faces two obstacles in demonstrating that the "plan provisions which, although unambiguous, did not allow for individual calculation of benefits." *Bloemker*, 605 F.3d at 444. Together they prove insurmountable. First, the Plan's provisions clearly make him ineligible for the 30-and-Out benefits, and the Plan does so with language that is accessible to an ordinary reader. *Pearce I*, 615 F. App'x at 348. In *Bloemker*, for example, the plaintiff sufficiently pleaded for the purposes of a motion to dismiss that the plan provisions did not allow him to calculate his benefits because it was "impossible for him to determine his correct pension benefit given the complexity of the actuarial calculations and his lack of knowledge about the relevant

actuarial assumptions." *Bloemker*, 605 F.3d at 443. In contrast, in *Haviland*, we held that the language in the plan document stating that the employer "reserves the right to amend, modify, suspend or terminate the [Plan] in whole or in part, at any time" was sufficiently accessible to the beneficiaries such that they should have been able to determine that their life-insurance benefits were subject to modification at any point. *Haviland*, 730 F.3d at 566, 569 (alteration in original).

Here, the relevant provision in the Plan document states: "[A] Vested Terminated Participant who met the eligibility requirements for early retirement at the date his employment terminated shall *not* be eligible to receive an Early Retirement Supplement . . . ." R. 12-3 (Plan Document at 40) (Page ID #426) (emphasis added). And a "Vested Terminated Participant" is "an individual whose employment with the Corporation ceased prior to the date he retired and who possessed a vested right to a Deferred Pension at the date of termination of his employment." *Id.* at 8 (Page ID #394). This language is more like the language from *Haviland* that we deemed "sufficiently accessible," than the actuarial calculations in *Bloemker*. Thus, if the court focuses only on the Plan document, Pearce cannot show that he was unable to determine that he would be ineligible for 30-and-Out benefits if he were terminated prior to retirement.

To avoid this conclusion, Pearce argues that we should instead look to the language of the SPD. "Under the terms of the SPD (but not the Plan because of its additional exclusion), [Pearce] qualifies for 30-and-Out benefits." *Pearce I*, 615 F. App'x at 349. And the SPD did not indicate that its recitation of the requirements for the 30-and-Out benefits was incomplete. In contrast, other portions of the SPD either explicitly or implicitly inform the reader that he must look beyond the four corners of the SPD for more complete information. *See, e.g.*, R. 12 (SPD at 31) (Page ID #145) ("For more information about the PBGC and the benefits it guarantees, ask your Plan Administrator or contact the PBGC."); *id.* at 23 (Page ID #137) (stating, without any further explanation, that: "Special rules apply to certain employees who became employees of the Company as part of an acquisition. In addition, certain foundry and asbestos employees may be entitled to additional credited service if they have worked on certain foundry and asbestos jobs for more than 10 years."). Thus, Pearce argues, he was not on notice that the SPD's

description of the requirements for the 30-and-Out benefits was incomplete, and that he should request a copy of the Plan document itself, rather than rely on the SPD.**[4]**

But Pearce points to no authority that supports his argument that we should look to the SPD, as opposed to the Plan document, when *Bloemker* specifically requires the language of the *plan* to prevent the beneficiary from calculating his benefits in order for the beneficiary to be entitled to equitable estoppel. Indeed, we have previously rejected a similar argument. In *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 546 (6th Cir. 2012), *cert. denied*, 568 U.S. 1157 (2013), the plaintiffs alleged that the U.S. Steel & Carnegie Pension Fund had promised to calculate their benefits using the five years of their employment in which they had earned the highest annual income. But the plan document restricted the pension-benefit-calculation formula to considering only years prior to 2000. *Id.* The difference mattered because many employees had higher annual incomes after 2000. *Id.* We held that the plaintiffs could not state a claim for equitable estoppel because the plan provisions were unambiguous and the plaintiffs were able to calculate their own benefits based on the plan document.

\* \* \*

To be entitled to equitable estoppel under § 502(a)(3), Pearce must be able to establish all eight *Bloemker* elements, as the contested Plan provision is unambiguous. *Deschamps*, 840 F.3d at 273. Pearce cannot satisfy the seventh required element; we thus affirm on that basis the district court's grant of summary judgment. *Medical Mut. of Ohio*, 548 F.3d at 389 (holding that we may affirm the grant of summary judgment on grounds other than those used by the lower court, as long as the non-moving party had the opportunity to respond).

---

**[4]**Of course, the SPD also cautioned its readers that while it "provide[d] *most* of the information you need to know about the Chrysler LLC Pension Plan, it is only a summary of Plan provisions," and "[i]f there is a conflict between this summary and the Plan document and trust agreement, the Plan document and trust agreement will govern." R. 12 (SPD at 2) (Page ID #116) (emphasis added). In *Pearce I*, we acknowledged that the SPD contained this general statement, but pointed out that "it would make no sense for Congress to require employers to provide clear, simple, complete descriptions of benefits plans if the employee were expected to also know and understand every clause in the voluminous, complex, and legalistic document the SPD was intended to accurately describe." 615 F. App'x at 349 n.6 (quoting *Helwig v. Kelsey-Hayes Co.*, 93 F.3d 243, 249–50 (6th Cir. 1996)).

## IV.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment to the Plan on Pearce's reformation request, **AFFIRM** summary judgment on Pearce's equitable estoppel request, and **REMAND** to the district court so that it can analyze Pearce's request for reformation utilizing the proper legal framework as articulated in this opinion.