**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0034n.06

No. 19-5132

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DANYEL O. MARTIN, Administratrix of the Estate of Edward T. Burke, IV, deceased, | ) ) ) | **FILED**<br>Jan 22, 2020<br>DEBORAH S. HUNT, Clerk |
| **Plaintiff–Appellant,** | ) ) | |
| v. | ) ) | |
| WARREN COUNTY, KENTUCKY et al., | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| **Defendants,** | ) ) ) | COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| SOUTHERN HEALTH PARTNERS, INC.; RONALD WALDRIDGE, MD, Individually; APRN BARRY DORITY, Individually; LPN TALANA LASLEY, Individually; LPN LYNN GRAY, Individually; TASHA HAFLEY-CRANE, Individually, | ) ) ) ) ) ) ) | **OPINION** |
| **Defendants–Appellees.** | ) ) ) | |

**Before: MOORE, McKEAGUE, and LARSEN, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** Edward "Eddie" Burke died from an adrenal crisis that began while he was detained at the Warren County Regional Jail ("the WCRJ") in Kentucky. His mother and the administratrix of his estate, Plaintiff-Appellant Danyel O. Martin, raised claims of inadequate medical care under the Fourteenth Amendment's Due Process Clause, pursuant to 42 U.S.C. § 1983, and state-law claims against the county, county officials, Southern Health Partners, Inc. ("SHP"), and SHP employees involved in Burke's medical care during his detention. Defendants-Appellees SHP and its employees Dr. Ronald Waldridge, MD; Barry

Dority,[1] APRN; Talana Lasley, LPN; Lynn Gray, LPN; and Tasha Hafley-Crane ("Crane") (collectively "the SHP defendants") filed a motion for summary judgment. The district court granted the motion. On appeal, Martin argues that the district court (1) applied the wrong standard for deliberate-indifference claims brought by pretrial detainees in light of *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and (2) erred in granting the motion because there are genuine issues of material fact under either the current standard or one set forth by *Kingsley*. Martin fails to demonstrate that material fact disputes exist. Thus, we **AFFIRM** the district court.

## I. BACKGROUND

### A. The Medical Services Program at the Warren County Regional Jail

At the time of Burke's pretrial detention, the WCRJ contracted with SHP to provide medical care to inmates. SHP hired Dr. Waldridge to serve as its Medical Director. R. 41-5 (Waldridge Contract). He was responsible for the operation of the medical-services program at the WCRJ. *Id.* at 2–4 (Page ID #3435–37); *see also* R. 41-1 (SHP Policies and Procedures at 12) (Page ID #3167). He was required to "provide professional medical services in combination with other physicians to assure that there is a physician on site at the [WCRJ] each week for approximately one to three hours." R. 41-5 (Waldridge Contract at 2) (Page ID #3435). Later, an addendum was added, providing that Dr. Waldridge "or his designee will visit [the WCRJ] on a weekly basis up to 5 hours, as well as take call from the SHP site medical staff when needed." R. 41-6 (Waldridge Contract Addendum at 1) (Page ID #3443).

To assist with his responsibilities, Dr. Waldridge hired Dority, an advanced practice registered nurse ("APRN"), who was responsible for conducting weekly visits to the jail, reviewing

---

[1]Dority's name is spelled inconsistently in the record. We use "Dority" because it appears to be the correct spelling. *See, e.g.*, R. 32-1 (Jail Admission Report at 2) (Page ID #1862).

medical services provided by staff, and seeing patients. R. 34-10 (Waldridge Dep. at 54) (Page ID #2824). Under this arrangement, Dr. Waldridge visited the WCRJ, which housed 350 to 400 inmates, once each quarter. R. 26-7 (Waldridge Dep. at 19–20) (Page ID #1081). SHP also employed licensed practical nurses ("LPNs") and other staff, such as medical technicians. There was always at least one LPN and one medical technician at the jail, and either Dr. Waldridge or Dority were available by phone. *See* R. 26-6 (Lasley Dep. at 34) (Page ID #1076); R. 26-10 (Gray Dep. at 12) (Page ID #1253).

## B. Burke's Detention and Treatment

Burke began his pretrial detention on November 5, 2015, after he was arrested for a parole violation. R. 32-1 (Jail Admission Report at 1) (Page ID #1861). He was twenty years old, *id.*; he turned twenty-one during his detention, *see id.* When he was admitted, he informed medical staff that he had diabetes, Addison's disease, and a history of substance abuse. R. 26-3 (Medical Staff Receiving Screening Form at 2) (Page ID #863). He also reported that he was taking medications for Type 1 Diabetes and Addison's disease, including insulin and prednisone, respectively. *See id.*; R. 26-2 (Martin Dep. at 18) (Page ID #858) (noting that Burke had Type 1 Diabetes).

The interaction of Burke's two chronic diseases, Type 1 Diabetes and Addison's disease, is especially relevant to this case. Burke had what is known as "brittle" diabetes, meaning that he suffered from drastic swings in his blood-sugar level across short periods of time, which were difficult to manage. R. 26-4 (Dahring Dep. at 78) (Page ID #942). "Addison's disease is 'a chronic type of adrenocortical insufficiency . . . . It . . . results in [a] deficiency of aldosterone and cortisol . . . .'" *Martin v. S. Health Partners, Inc.*, No. 1:17-CV-00020-GNS-HBB, 2019 WL 539064, at *1 n.2 (W.D. Ky. Feb. 11, 2019) (last alteration in original) (quoting *Goldstein v. McDonald*, No. 15-1250, 2016 WL 1458490, at *1 n.1 (Vet. App. Apr. 14, 2016)). Addison's disease can cause

an Addisonian, or adrenal, crisis, which may "lead to severe low blood pressure, severe weakness, and even death." R. 34-10 (Waldridge Dep. at 88) (Page ID #2858). The exact cause of these crises is unclear, but stress and infection can trigger one. *Id.* at 88–89 (Page ID #2858–59). Addison's disease is treated with corticosteroids, *id.* at 89 (Page ID #2859), such as prednisone in Burke's case, R. 26-3 (Medical Staff Receiving Screening Form at 2) (Page ID #863). Corticosteroids, however, increase blood-sugar levels, R. 34-10 (Waldridge Dep. at 89) (Page ID #2859), which is problematic for a person with insulin-dependent diabetes. Thus, the treatment of Burke's diabetes was complicated by the treatment of his Addison's disease.

To manage his diabetes, the SHP staff administered short- and long-term insulin. There were standing orders at the top of each blood-sugar flow sheet that Burke should receive a dose of long-term insulin in the morning and at night. *E.g.*, R. 26-11 (Blood Sugar Flow Sheets at 2) (Page ID #1257). The staff also read his blood-sugar level throughout the day to assess if and when he should receive short-term insulin and how much based on a sliding scale. R. 26-13 (Crane Dep. at 51–52) (Page ID #1290). Burke's blood-sugar level was checked at least three times a day, after each meal. *See* R. 26-4 (Dahring Dep. at 96–97) (Page ID #960–61) (four times); R. 34-5 (Gray Dep. at 51) (Page ID #2372) (three times); *see generally* R. 26-11 (Blood Sugar Flow Sheets). Sometimes, he would also be given glucose tablets and/or juice if his blood-sugar level was low. *See, e.g.*, R. 26-11 (Blood Sugar Flow Sheets at 3) (Page ID #1258). It is undisputed that Burke's blood-sugar level fluctuated rapidly, that short-term insulin was administered at irregular times, *see* R. 26-11 (Blood Sugar Flow Sheets), and that Burke would sometimes refuse short-term insulin or request that it be reduced, *see* R. 26-13 (Crane Dep. at 52–53) (Page ID #1290); R. 26-17 (Refusal of Medical Treatment and Release of Responsibility Dec. 13, 2015) (Page ID #1364).

During Burke's detention, he suffered incidents related to his diabetes. On November 8, 2015, emergency medical services were called because his blood-sugar level was too low—it was recorded as "22."[2] R. 26-16 (Progress Notes at 6) (Page ID #1360). On January 9, 2016, Burke alerted staff that he thought he had gone into a diabetic coma, and staff monitored him. *Id.* at 4 (Page ID #1358). Eleven days later, on January 20, 2016, Burke notified staff that he felt like he was going to pass out, his blood-sugar level was again recorded as low, "37," and staff gave him glucose tablets. *Id.*

Regarding Burke's Addison's disease, it is undisputed that he was not given his prescribed daily prednisone dose for more than two months. Dority directed that Burke receive daily prednisone during an appointment in early January. R. 34-4 (Dority Dep. at 52–53) (Page ID #2224–25); R. 26-14 (Medication Administration Record at 3) (Page ID #1296). After this, Burke received prednisone until he was transferred to the hospital on January 31, 2016, except when he refused it on January 30, 2016. *See* R. 26-18 (Refusal of Medical Treatment and Release of Responsibility Jan. 30, 2016) (Page ID #1366).

Burke refused this dose of prednisone because he believed that his blood-sugar level was too high and that the prednisone would raise it further. *See id.* Crane, a medical technician, gave him a refusal-of-treatment form that she filled out and Burke signed. *See id.* Although the form indicated that Burke was counseled about the risks of refusing his prednisone, *id.*, it is undisputed that he was not counseled by SHP staff, Appellant Br. at 25; *see* Appellee Br. at 17–21, 44, 50–51 (raising other arguments but not contesting that SHP staff failed to counsel Burke upon his refusal).

---

[2]"Normal fasting blood sugar level is between 70 and 100 mg/dl." Appellant Br. at 11 n.2; *see also* R. 26-11 (Blood Sugar Flow Sheets at 2) (Page ID #1257) (noting that normal fasting blood-sugar levels are "less than 110").

On January 31, 2016, Burke's blood-sugar level fluctuated. At 6:15 a.m., his blood-sugar level was above average, "374." R. 26-11 (Blood Sugar Flow Sheets at 2) (Page ID #1257). Then he was given short- and long-term insulin. *Id.*; R. 34-3 (Crane Dep. at 25) (Page ID #2100). At 11:07 a.m., Burke's blood-sugar level was "72." R. 26-11 (Blood Sugar Flow Sheets at 2) (Page ID #1257). Burke requested his blood-sugar level be checked at 2:25 p.m., and Crane did so. R. 26-13 (Crane Dep. at 57–58) (Page ID #1291–92). It was "296." R. 26-11 (Blood Sugar Flow Sheets at 2) (Page ID #1257). Crane told Gray, the LPN on duty, about Burke's blood-sugar level. R. 34-3 (Crane Dep. at 31–33) (Page ID #2106–08). Gray decided not to give him insulin because "[w]e are still a little out from supper, we don't want to bottom his sugar completely out," but that they would "recheck it in a little bit." *Id.* at 33 (Page ID #2108). She did not examine Burke or his medical chart. Crane informed Burke of Gray's decision. R. 26-13 (Crane Dep. at 58) (Page ID #1292).

At 3:23 p.m., Burke collapsed. R. 26-16 (Progress Notes at 4) (Page ID #1358). Efforts to revive him were unsuccessful, *id.*, and he was transferred to the hospital, R. 26-19 (Hospital Detail Activity Log at 7) (Page ID #1373). After a period on life support, Burke died on February 1, 2016. R. 15-3 (Pfalzgraf Report at 1) (Page ID #131). The cause-of-death medical expert Dr. Robert R. Pfalzgraf opined that Burke died from an Addisonian crisis brought on by missing his dose of prednisone on January 30, 2016 after regularly taking it since January 8, 2016.[3] *Id.* at 2 (Page ID #132).

---

[3]We do not know why Burke did not suffer an Addisonian crisis when he was admitted to the WCRJ and stopped receiving prednisone. However, Martin does not raise on appeal the apparent failure of the SHP defendants to provide prednisone for the first two months of his detention.

## C.  Procedural History

As the administratrix of Burke's estate, Martin filed a complaint alleging that the county, county officials, SHP, and SHP employees violated Burke's right to adequate medical care under the Fourteenth Amendment's Due Process Clause and were negligent under state law.  R. 1 (Compl.) (Page ID #1–17).  All county defendants were dismissed, as were four other LPNs employed by SHP, pursuant to agreed orders of dismissal.  R. 17 (First Agreed Order of Dismissal) (Page ID #138) (dismissing county and county officials); R. 43 (Second Agreed Order of Dismissal) (Page ID #3463) (dismissing other LPNs).  The remaining defendants, the SHP defendants, filed a motion for summary judgment.  R. 26 (Mot. for Summary J.) (Page ID #826). The district court granted the motion, declining to apply a new standard for deliberate-indifference claims brought by pretrial detainees based upon *Kingsley*, limiting Martin's claims to claims related to the missed prednisone dose, and concluding that Martin failed to meet her burden at summary judgment to show material issues of fact existed to demonstrate deliberate indifference and causation.  *Martin*, 2019 WL 539064, at *3–6.  This appeal timely followed.  *See* R. 46 (Notice of Appeal) (Page ID #3479).  An amicus brief was filed by the Roderick and Solange MacArthur Justice Center, addressing the proper standard for deliberate-indifference claims brought by pretrial detainees in the wake of *Kingsley*.

## II.  STANDARD OF REVIEW

We review district court grants of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor.  *Sec'y of Labor v. Timberline S., LLC*, 925 F.3d 838, 843 (6th Cir. 2019) (citing *Pearce v. Chrysler Grp. LLC Pension Plan*, 893 F.3d 339, 345 (6th Cir. 2018)).  Summary judgment is appropriate if there is no genuine dispute as to any material issue of fact.  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); Fed. R. Civ. P. 56(a). To meet her burden at summary judgment, "[t]he nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). If "the evidence presents sufficient disagreement to require submission to a jury," there is a genuine issue of material fact. *Anderson*, 477 U.S. at 251–52.

## III. INADEQUATE MEDICAL CARE

To succeed on a § 1983 claim, "a plaintiff must prove '(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Shadrick v. Hopkins County*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010)). Private companies (and their employees) that perform traditional state functions, such as providing medical care to inmates, are state actors "for the purposes of § 1983." *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (citing *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)). Common law tort principles govern causation in the § 1983 context. *Powers v. Hamilton Cty. Pub. Defender Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007) (citing *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005)).

As our precedent stands, we analyze pretrial detainees' Fourteenth Amendment claims of deliberate indifference under the same framework for deliberate-indifference claims brought by prisoners pursuant to the Eighth Amendment, including claims of inadequate medical care. *See Jones*, 625 F.3d at 941 (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)). A claim of deliberate indifference to serious medical needs has two components— objective and subjective. *Winkler*, 893 F.3d at 890. To satisfy the objective component, a pretrial detainee must show that he had a "sufficiently serious medical need." *Id.* (quoting *Spears v. Ruth*,

589 F.3d 249, 254 (6th Cir. 2009)). As to the subjective component, a pretrial detainee must demonstrate that the defendants "have 'a sufficiently culpable state of mind in denying medical care.'" *Jones*, 625 F.3d at 941 (quoting *Blackmore*, 390 F.3d at 895); *see generally id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (specifying what a plaintiff must prove to satisfy the subjective component).

On appeal, Martin argues that the district court applied the wrong standard to her deliberate-indifference claims in light of *Kingsley*, but she does not meet her burden at summary judgment for reasons that do not depend on the standard for evaluating pretrial detainees' deliberate-indifference claims. She provides verifying medical evidence of a serious medical injury only for Burke's missed dose of prednisone, his death, and so she cannot proceed on claims unrelated to that injury. But her brief focuses on the general treatment of Burke's diabetes, and so she fails to point to relevant, specific facts demonstrating a question for the jury. On her remaining claims against the individual defendants, Martin fails to demonstrate a factual dispute as to causation, or when she does, she does not show conduct beyond negligence.[4] Her briefing also fails to provide more than unadorned assertions in support of her claims against Dr. Waldridge for supervisory liability and against SHP. In short, the brief's focus on alleged injuries that are unsupported by verifying evidence, as required at this stage of litigation, means that Martin points

---

[4]Martin argues that *Kingsley* requires an objective reasonableness standard. Appellant Br. at 34–35. *But see* Amicus Br. at 6 (arguing that the proper standard is objective deliberate indifference). In *Kingsley*, the Court held that a pretrial detainee's Fourteenth Amendment excessive-force claim was governed by an objective standard, specifically objective reasonableness. 135 S. Ct. at 2472–73. Whether an objective standard applies to pretrial detainee claims of deliberate indifference and what the standard entails are open questions, though we have noted that *Kingsley* "calls into serious doubt" the application of the subjective component of the deliberate-indifference test usually applied to pretrial detainees' claims. *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018). *But see Winkler*, 893 F.3d at 890 (failing to address *Kingsley*). Whatever *Kingsley* requires, it is more than negligence. 135 S. Ct. at 2472 ("[L]iability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." (emphasis in original) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998))). Because Martin at best shows negligent conduct when she does not otherwise fail to make a showing of causation, we leave the *Kingsley* question for another day.

to few facts that align with her claims premised upon Burke's missed dose of prednisone. Accordingly, Martin fails to satisfy her burden.

## A. Verifying Medical Evidence

To satisfy the objective component, a plaintiff must identify a serious medical need, which is "one 'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Jones*, 625 F.3d at 941 (quoting *Harrison*, 539 F.3d at 518). When a serious medical need is obvious, a plaintiff does not need to provide verifying medical evidence of harm. *Blackmore*, 390 F.3d at 899–900 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). But when a serious medical need is not obvious and "is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," plaintiffs must supply medical proof of injury at summary judgment so that we are able "to assess whether the delay [in adequate medical care] caused a serious medical injury." *Id.* at 898 (citing *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001)). This includes claims of "delayed administration of medication," "a prisoner's refusal to take the prescribed medication," and "occasional missed doses of medication." *Id.* at 897.

Several examples are illustrative. To demonstrate that a delay in dialysis treatment was an objectively serious medical need, the plaintiff in *Napier* was required to provide evidence that the delay harmed his kidney condition. 238 F.3d at 742–43. But appendicitis accompanied by "obvious manifestations of pain and injury," including long bouts of intense stomach pains and the plaintiff's verbal and written complaints of pain over the course of two days, was an obviously serious medical risk that did not require verifying medical evidence. *Blackmore*, 390 F.3d at 899. Most relevantly, we concluded in *Garretson v. City of Madison Heights* that a plaintiff's claim

about the adequacy of care she received for her insulin-dependent diabetes required verifying medical evidence of harm. 407 F.3d 789, 797 (6th Cir. 2005). There, the plaintiff satisfied her burden by providing proof that she was hospitalized for several days after missing her physician-mandated treatment—insulin injections. *Id.*

Martin's claims about the treatment of Burke's diabetes and Addison's disease are controlled by *Napier*. Like the *Garretson* plaintiff, Burke required regular doses of medication—insulin and prednisone—and Martin argues that Burke did not receive what he was prescribed as it was supposed to be administered. Thus, her claims are about the adequacy of treatment. She must provide verifying medical evidence that the treatment Burke received for his diabetes and Addison's disease caused him serious medical injury.

The parties agree that Martin has provided verifying medical evidence as to the missed prednisone dose. Martin offered Dr. Pfalzgraf's report and testimony, in which he opined that Burke's missed dose of prednisone led to an adrenal crisis that caused his death. However, Martin has not put forth evidence verifying that a serious medical injury resulted from the general treatment of Burke's diabetes or Addison's disease,[5] including the treatment he received on January 31, 2016. Therefore, we proceed to consider only Martin's arguments pertaining to the prednisone dose that Burke missed on January 30, 2016.

Martin argues that she does not need to put forth verifying evidence of injury for her claims about the treatment of Burke's diabetes because his serious medical need was obvious. *See* Reply Br. at 9, 14–15. Yet Martin does not distinguish her delay-in-adequate-care claim based on

---

[5]Although Martin does not appear to challenge the SHP defendants' failure to administer prednisone, it is less clear if she challenges the management of Burke's Addison's disease in her various claims that address the failure of the SHP defendants to follow their protocols and policies. To the extent that she does, we dispose of those claims here.

Burke's brittle diabetes from the delay-in-adequate-care claim based upon diabetes in *Garretson*. In fact, Martin asserts elsewhere that Burke's conditions were objectively serious not because they were obvious, but because they "had been diagnosed by a physician as mandating treatment," and she cites *Garretson* for this proposition. Appellant Br. at 36. Even putting *Garretson* aside, Burke's brittle diabetes was not an obviously serious medical need. A layperson could not easily determine when Burke needed a doctor and what harm he suffered from a delay in treatment due to the drastic, but still typical, blood-sugar fluctuations and other symptoms of brittle diabetes.[6] *See Blackmore*, 390 F.3d at 899 (distinguishing appendicitis from a kidney condition in *Napier* "where the injury to the prisoner's kidney condition could not be discerned without competent medical proof"). And nothing in the record about the events on January 31, 2016 demonstrates that Burke's serious medical need transformed into an obvious one prior to his loss of consciousness.[7] Therefore, we cannot consider Martin's arguments based upon the SHP defendants' treatment of Burke's diabetes.

---

[6]Martin refers to pain and suffering as a harm from the delay in adequate treatment of Burke's diabetes, Appellant Br. at 19–20, and points to the testimony of the standard-of-care expert, Renee Dahring, Reply Br. at 9. Dahring testified that the decisions Gray made on January 31, 2016 would have caused Burke "discomfort, anxiety . . . suffering . . . [and] fear." R. 26-4 (Dahring Dep. at 119) (Page ID #983). Assuming *arguendo* that this is an adequate showing, Martin does not point to facts that show that Gray's conduct was more than negligent. Despite Martin's characterizations that Gray "did nothing" on January 31, 2016 when Burke requested insulin, Appellant Br. at 28 (emphasis omitted), the record reflects that Gray decided to decline Burke's request because she was concerned that giving him the requested insulin would cause his blood sugar level to drop too low, *supra* Section I.B. This is "disagreement . . . over the proper course of treatment," which is "at most, a medical-malpractice claim," and so it "is not cognizable under § 1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)); *see also id.* ("Additionally, '[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to . . . constitutionalize claims which sound in state tort law.'" (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976))).

[7]Martin does not challenge the care that Burke received from this point on, including efforts to resuscitate him and his transfer to the hospital.

12

**B. Lasley, Gray, Dority, and Dr. Waldridge (Individual Capacity)**

Martin fails to demonstrate a material fact dispute as to causation for her claims against Lasley, Gray, Dority, and Dr. Waldridge as an individual. As an initial matter, Martin's brief does not address causation by name; in some instances, it also does not attempt to attribute complained of conduct to the individual defendant who acted. *See* Appellant Br. at 36–37. Martin argues that Lasley and Gray violated their "scope[s] of practice" by giving Burke medications for scabies and heartburn without consulting Dr. Waldridge or Dority about the possible effects of the medications on Burke's diabetes or Addison's disease. *Id.* at 23–24 (identifying the medications), 38. But she does not link Lasley's and Gray's decisions to the missed dose of prednisone. For her claims against Dority, Martin addresses only diabetes-based claims in her brief, which we do not consider further, as explained above. *Id.* at 36–38.

Regarding her claim against Dr. Waldridge, Martin also argues that he did not prepare a Special Needs Treatment Plan for Burke or personally monitor him and that Dr. Waldridge maintained an unconstitutional business model by breaching his contract with SHP by delegating his scheduled visits to the WCRJ to Dority.[8] *Id.* at 36–38, 42. However, she does not demonstrate that Dr. Waldridge's conduct caused Burke to miss his dose of prednisone. For example, Martin's brief does not show how a treatment plan or personal monitoring would have prevented Burke from skipping his dose of prednisone or how Dr. Waldridge's "business model" caused Burke to miss his dose of prednisone. In sum, Martin fails to provide specific facts demonstrating causation or facts from which we could infer causation; she hopes that we will infer causation from nothing, but, without more, the only inferences we can draw are too attenuated to support causation.

---

[8]Martin misrepresents the record. The addendum to Dr. Waldridge's contract noted that he could send a designee to visit the WCRJ.

## C. Crane

For her claim against Crane, Martin does not demonstrate that a genuine issue of material fact exists. She argues that "Crane failed to inform anyone of Burke's refusal of his Prednisone on January 30, even though the refusal-of-treatment form she filled out required Waldridge's signature" and for Burke to be apprised of the risks of refusing the prednisone.[9] Appellant Br. at 38; *see also* Reply Br. at 17–18. The failure to adhere to policies, without more, is only negligence. *Winkler*, 893 F.3d at 891–92. Martin provides no other facts that show Crane was more than negligent, such as, but not limited to, what she knew or should have known as a medical technician about the risk of Burke's refusal. This is insufficient at the summary-judgment stage.

## D. Doctor Waldridge (Supervisory Capacity)

Martin fails to meet her burden at summary judgment for her supervisory-liability claim against Dr. Waldridge. She argues that Dr. Waldridge failed to supervise the nurses to ensure that they complied with policies and procedures for transfers and inappropriately delegated his duty to do so to Dority. Appellant Br. at 39–40. For supervisory liability to attach, Martin must demonstrate that Dr. Waldridge "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Coley v. Lucas County*, 799 F.3d 530, 542 (6th Cir. 2015) (emphasis omitted) (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)). This claim depends on unconstitutional conduct of subordinates, and Martin has not demonstrated a material issue of fact for her constitutional claims against Lasley, Gray, Dority, or Crane. Moreover, Martin makes no effort to satisfy the knowledge component. Although her brief cites *Taylor* for the proposition that supervisors cannot abandon their duties "in the face of actual

---

[9]At oral argument, Martin's counsel clarified that this is an argument that Crane failed to follow a policy, not that she should have advised Burke herself.

knowledge of a breakdown in the proper workings of the department," Appellant Br. at 40 (quoting *Taylor*, 69 F.3d at 81), she does not point to facts that indicate that there was, in fact, a breakdown in the proper workings of the medical services program's hospital transfers and that Dr. Waldridge knew it. The brief cites legal rules, but does not supply relevant, specific facts to which it can apply them. Martin has not shown a material issue of fact as to her supervisory-liability claim against Dr. Waldridge.

## E. Southern Health Partners

Martin argues that SHP failed to supervise Dr. Waldridge and to ensure that he fulfilled SHP's policies, failed to train and supervise its employees about its policies and procedures, and maintained an unconstitutional business model. Appellant Br. at 39–43. Although Martin frames her claims against SHP as one for supervisory liability, her claims are against an entity, and so we construe them as claims premised upon entity liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See Shadrick*, 805 F.3d at 738 & n.6. We interpret her arguments as ones that SHP had a custom or policy of failing to train or supervise its employees, including Dr. Waldridge, and of maintaining an unconstitutional business model.

To defeat summary judgment on a failure-to-train claim, Martin must show that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the [entity's] deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902 (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). Martin does not address how SHP's failure to train its employees, including Dr. Waldridge, as to the policies that she enumerates—most of which she connects to the treatment of Burke's diabetes—caused Burke to miss his dose of prednisone. For instance, Martin argues that Lasley did not know why Dr. Waldridge should "establish a clinical

treatment plan," Appellant Br. at 40–41, but we cannot guess how Lasley's lack of training about Dr. Waldridge's responsibilities caused Burke to miss his dose of prednisone. Viewing the record in the light most favorable to Martin, the record shows that had SHP trained its staff on the specified policies, staff would have had to fill out more forms setting Burke's baseline of care and recording his progress, particularly for his diabetes. *See id.* at 15–19. However, there is no indication how following these policies would have prevented Burke's missed dose of prednisone.

Finally, Martin argues that SHP maintained an unconstitutional business model by breaching its contract with the WCRJ. *Id.* at 42–43. She provides no legal authority in support of this theory of *Monell* liability, but we have recognized that claims premised upon systemic shortcomings of medical-care providers may be cognizable under the Eighth Amendment. *See North v. Cuyahoga County*, 754 F. App'x 380, 392 (6th Cir. 2018). Yet we do not know what a successful claim would look like here. Although Martin's weak summary-judgment showing still makes clear that the contractual structure or arrangement between SHP and the WCRJ raises concerns regarding the administration of the jail medical program, her briefing does not come close to identifying widespread failure that SHP knew or should have known about or how these failures caused Burke to skip his dose of prednisone. The brief does not refer to or provide evidence of other similar incidents. Accordingly, Martin fails to demonstrate an issue of material fact on this record for her claims against SHP.

## IV.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.