RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TRUSTEES OF THE IRON WORKERS DEFINED
CONTRIBUTION PENSION FUND, IRON WORKERS LOCAL
25 PENSION FUND, IRON WORKERS HEALTH FUND OF
EASTERN MICHIGAN, IRON WORKERS LOCAL 25
VACATION PAY FUND, and IRON WORKERS
APPRENTICESHIP FUND OF EASTERN MICHIGAN,

　　　　　　　　　　　　　*Plaintiffs-Appellees*,

　　　*v*.

NEXT CENTURY REBAR, LLC,

　　　　　　　　　　　　　*Defendant - Appellant*.

> Nos. 23-1919/24-1046

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-13041—Nancy G. Edmunds, District Judge.

Argued:  July 25, 2024

Decided and Filed:  August 15, 2024

Before:  MOORE, COLE, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Bryan R. Walters, VARNUM LLP, Grand Rapids, Michigan, for Appellant.  Laura H. Lindsay, HESSIAN & MCKASY, P.A., Minneapolis, Minnesota, for Appellees.  **ON BRIEF:**  Neil E. Youngdahl, VARNUM LLP, Grand Rapids, Michigan, Maureen Rouse-Ayoub, VARNUM LLP, Novi, Michigan, for Appellant.  Laura H. Lindsay, William A. Cumming, HESSIAN & MCKASY, P.A., Minneapolis, Minnesota, for Appellees.

Nos. 23-1919/            *Trustees of the*            Page 2
24-1046      *Iron Workers Defined Contribution Pension Fund, et al. v.*
*Next Century Rebar, LLC*

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. Next Century Rebar, LLC ("NCR") worked on a chemical project within the jurisdiction of the Local Union Number 25 ("Local 25"). Because Local 25 did not have enough iron workers to fulfill the project's needs, NCR hired iron workers affiliated with out-of-state unions, specifically Local Union Numbers 416 and 846 ("Local 416" and "Local 846," respectively). For the duration of the project, NCR made benefits contributions to the funds associated with the out-of-state iron workers' unions. In 2021, funds affiliated with Local 25—Iron Workers Health Fund of Eastern Michigan, Iron Workers Local 25 Vacation Pay Fund, and Iron Workers Apprenticeship Fund of Eastern Michigan (the "Local 25 Funds")—conducted an audit and determined that NCR had failed to make benefits contributions on behalf of the out-of-state employees to the Local 25 Funds. NCR contested this finding and refused to pay the contributions, explaining that it had made contributions on behalf of these employees to the funds affiliated with the out-of-state unions, as opposed to the Local 25 Funds.

The Local 25 Funds filed suit under 29 U.S.C. § 1145, arguing that they are entitled to benefits contributions for the out-of-state employees that performed work in its jurisdiction. The Local 25 Funds filed a motion for summary judgment, which NCR opposed. The district court granted the motion and issued judgment awarding the Local 25 Funds $1,787,300.75 in unpaid contributions, $143,075.41 in interest, and $288,598.80 in liquidated damages. Thereafter, the Local 25 Funds moved for attorney fees and costs, and the district court amended the judgment to include $18,233.15 in costs and $99,812.25 in attorney fees. NCR filed timely notices of appeal from the judgment and the amended judgment, which have been consolidated before this court. On appeal, NCR argues that the district court applied the incorrect summary-judgment standard, the district court improperly granted summary judgment despite genuine disputes of material fact related to the damages calculation, and the district court abused its discretion by declining to award NCR a setoff in the amount it contributed to the out-of-state funds.

Nos. 23-1919/
24-1046

*Trustees of the
Iron Workers Defined Contribution Pension Fund, et al. v.
Next Century Rebar, LLC*

Page 3

For the reasons that follow, we **AFFIRM in part** and **REVERSE in part** and **REMAND** this case for further proceedings.

## I. BACKGROUND

NCR installs reinforcing steel nationwide. R. 38-2 (Grantham Decl. ¶ 2) (Page ID #848). Between June 2020 and October 2021, NCR worked on a Chemical Bank project in Detroit, Michigan (the "Michigan Project"), which required workers from the Local 25 union. *Id.* ¶¶ 5–6, 8 (Page ID #848–49). Local 25 did not have enough iron workers to meet the needs of NCR's Michigan Project, so Local 25 instructed NCR to hire out-of-state iron workers. *Id.* ¶ 8 (Page ID #849). NCR then hired iron workers who were members of Local 846 and Local 416. *Id.* ¶¶ 8–9 (Page ID #849). For the duration of the Michigan Project, NCR paid the Local 846 and Local 416 workers using the wage rates set by their respective out-of-state unions. *Id.* ¶ 16 (Page ID #850). The relevant Local 25 base hourly wage was $28.82; whereas the Local 416 base wage was $41.00 per hour in 2020 and $43.00 per hour in 2021, and the relevant Local 846 base wage was $18.00 per hour. *Id.* ¶¶ 11–14 (Page ID #849).[1]

Local 25 benefits contributions are calculated using hours worked, hours paid, or wage rates, and the calculation differs depending on the type of benefit fund (pension, vacation, etc). *See generally* R. 38-3 (Local 25 CBA at art. V, §§ 1–10) (Page ID #868–70). For the workers on the Michigan Project, NCR made benefits contributions to the home union of each employee, meaning that NCR made contributions to the out-of-state funds for the Local 416 and Local 846 employees using the rates established in those unions' collective bargaining agreements. R. 38-2 (Grantham Decl. ¶ 10) (Page ID #849); *see also* R. 38-10 (Grantham Dep. at 24:25–25:19) (Page ID #1184).[2] NCR determined how to make contributions on behalf of the out-of-state employees by consulting with each of the unions. For example, Local 846 instructed NCR to pay "any

---

[1]The base wages differ based on the employees' position (journeyman, foreman, etc.), *see, e.g.*, R. 38-18 (Local 25 Rate Schedules at 1) (Page ID #1238), and the employees' years of experience, *see* R. 38-7 (Reeves Dep. at 46:7–9) (Page ID #1001); however, for purposes of simplicity—and because the parties refer only to the above-cited wage rates—we use these rates as the relevant wages from each union, unless we specify otherwise.

[2]NCR paid the Local 416 and Local 846 employees' vacation-fund contributions to Local 25. R. 38-10 (Grantham Dep. at 25:4–13) (Page ID #1184); R. 38-7 (Reeves Dep. at 33:4–11) (Page ID #988).

Nos. 23-1919/
24-1046

*Trustees of the
Iron Workers Defined Contribution Pension Fund, et al. v.
Next Century Rebar, LLC*

Page 4

disparity in the benefit package between Local 25 and Local 846" by adding it to the workers' hourly wage, and NCR complied by increasing the Local 846 employees' wage from, for example, $18.00 to $54.12 per hour for journeymen.  R. 38-2 (Grantham Decl. ¶¶ 18–20) (Page ID #850).  Additionally, NCR asked Local 25 what benefits NCR must contribute to Local 25 for the out-of-state workers on the Michigan Project.  R. 38-5 (7/29/2020 Email at 1) (Page ID #909).  Anthony Ramos, a Local 25 business agent, instructed NCR to make benefits contributions, except for vacation contributions and dobie dues,[3] "to the Locals that supplied the ironworkers on the Michigan Project, namely Local 846 and Local 416."  R. 38-2 (Grantham Decl. ¶ 10) (Page ID #849).[4]

In 2021, the Local 25 Funds conducted an audit of NCR's contributions and determined that there were $941,358.46 in unpaid contributions—as well as an additional sum of liquidated damages—for the period of June 2020 through March 2021.  R. 36-5 (Reeves Decl. ¶¶ 6–8) (Page ID #429–30); R. 36-9 (Audit at 1–4) (Page ID #546–49).[5]  NCR contested the audit's conclusion that there were unpaid contributions to the Local 25 Funds because NCR had already made contributions on behalf of the relevant employees to their home unions.  R. 38-20 (NCR Ltr. at 1) (Page ID #1255).  The auditor was aware of NCR's contributions to the out-of-state funds and inquired about whether that should be factored into the final calculation of unpaid contributions.  *See* R. 38-7 (Reeves Dep. at 31:18–33:16) (Page ID #986–88); R.38-15 (9/14/2021 Email at 1) (Page ID #1227).  The audit was not adjusted based on the out-of-state contributions.  R. 38-16 (9/15/2021 Email at 1) (Page ID #1230).

---

[3]Dobie dues are "a fee that [employers] pay to [Local] 25 to let [the employer] use [workers] from another area or another union."  R. 38-10 (Grantham Dep. at 18:13–14) (Page ID #1183).

[4]The Local 25 Funds—and Ramos—dispute that this instruction was given.  *See* R. 36-4 (Ramos Decl. ¶ 7) (Page ID #426); D. 20 (Appellee Br. at 5–6, 35).

[5]The Local 25 Funds updated the audit during litigation based on documents that NCR produced in discovery.  *See* R. 36-5 (Reeves Decl. ¶ 9) (Page ID #430).  The final calculation totaled $1,787,300.75 in unpaid contributions, as well as an additional sum of liquidated damages.  *See id.* ¶ 11 (Page ID #431–32).  NCR challenges the total estimate, including the updated estimate produced during litigation.  *See* D. 18 (Appellant Br. at 35–36).

Nos. 23-1919/    *Trustees of the*    Page 5
24-1046    *Iron Workers Defined Contribution Pension Fund, et al. v.*
*Next Century Rebar, LLC*

## A.  The Governing Agreements

There are two contracts pertinent to this appeal:  the Local 25 Collective Bargaining Agreement (the "Local 25 CBA") and the International Agreement.  NCR is a signatory to both. *See* R. 38-3 (Local 25 CBA at 32) (Page ID #894); R. 38-4 (Int'l Agreement at 6) (Page ID #907).

The International Agreement states, in relevant part, that NCR "agrees to abide by the work rules, pay the scale of wages and benefits, work the schedule of hours, and abide by the terms and conditions of employment in force and effect in the Local Union in which the Employer is performing or is to perform work."  R. 38-4 (Int'l Agreement § 6(A)) (Page ID #903).  For all non-key employees,[6] NCR "agrees to make timely payments into all fringe benefit funds in accordance with the applicable Local Union collective bargaining agreement," including the "pension[] . . . [and] vacation" funds. *Id.* § 6(C) (Page ID #904).  If NCR fails "to make remittances to any fringe benefit funds . . . [it] shall [be] subject . . . to all penalty, liquidated damage, interest, attorneys and expert fees, and other amounts due and owing pursuant to the Local Union collective bargaining agreement[]."  *Id.* § 6(D) (Page ID #904).  "Under no circumstances," however, "shall there be a request for a payment of double fringe benefit amounts (benefits paid to more than one Local Union's funds) as a result of work performed under this agreement." *Id.*  Thus, NCR was required to make its benefits contributions related to the out-of-state employees working in the Local 25 jurisdiction "in accordance with the applicable Local Union collective bargaining agreement," *id.* § 6(C); *see also id.* § 6(A), which was the Local 25 CBA.

The Local 25 CBA explains that benefits contributions are due monthly and are calculated based on the type of fund. *See generally* R. 38-3 (Local 25 CBA at art. V, § 1–10) (Page ID #868–88).  "For each employee" working in the Local 25 jurisdiction, employers are required to contribute to the pension fund "an amount equal to the percentages as outlined in

---

[6]Although this was at issue below, no party argues on appeal that the relevant employees were designated as "Key Employees."

Nos. 23-1919/          *Trustees of the*                    Page 6
24-1046      *Iron Workers Defined Contribution Pension Fund, et al. v.*
                        *Next Century Rebar, LLC*

Article III." *Id.* at art. V, § 4 (Page ID #868). And "[f]or each employee" working in the Local 25 jurisdiction, employers are required to contribute to the vacation fund "an amount equal to the percentages as outlined in Article III of the Employee's gross earnings before taxes." *Id.* at art. V, § 6 (Page ID #869). Article III directs employers to contact a union representative for the relevant wage rate schedules. *Id.* at art. III (Page ID #867). The parties have provided the Local 25 Rate Schedules for the relevant period. *See* R. 38-18 (Local 25 Rate Schedules at 1) (Page ID #1238).

Finally, although not central to the dispute here, there is also a reciprocity agreement among the local funds under which benefit contributions can be transferred from the fund covering the jurisdiction where the work was performed (the "Work Funds") to the fund covering the employee's home jurisdiction (the "Home Funds"). R. 36-2 (Sawhill Decl. ¶ 9) (Page ID #417); *see also* R. 36-17 (Reciprocity Agreement at 2–3) (Page ID #647–48). Under the reciprocity agreement, the employee must make an "affirmative election" that they wish to transfer contributions and then the Work Funds determine which contributions will be transferred to the Home Funds. R. 36-2 (Sawhill Decl. ¶ 9) (Page ID #417). Even when employees elect to transfer their benefits, the employer makes its benefits contributions to the Work Funds, and the Work Fund then effectuates the transfer. *Id.* Here, there were some out-of-state employees who affirmatively *declined* to have their pension contributions transferred to their Home Funds. R. 39-3 (Reciprocity Elections at 833–62) (Page ID #1276–88).

## B. The Proceedings Below

After NCR declined to make contributions to Local 25 on behalf of the out-of-state employees, the Local 25 Funds filed suit in federal court alleging that NCR breached the Local 25 CBA and violated 29 U.S.C. § 1145. R. 1 (Compl. ¶¶ 23–27) (Page ID #6–7). The Local 25 Funds requested $1,006,731.18 in unpaid contributions, as well as liquidated damages, interest, court costs, audit and other collection costs, and attorney fees. *Id.* ¶ 27 (Page ID #7). NCR moved for leave to file a third-party complaint against Local 846. R. 16 (Mot. for Leave at 1–5) (Page ID #152–56). The district court granted the motion and instructed NCR to file the third-

Nos. 23-1919/
24-1046

*Trustees of the
Iron Workers Defined Contribution Pension Fund, et al. v.
Next Century Rebar, LLC*

Page 7

party complaint by October 30, 2022. R. 29 (10/18/2022 D. Ct. Order at 3) (Page ID #338). NCR did not file a third-party complaint.

Thereafter, the Local 25 Funds filed a motion for summary judgment. *See* R. 36 (Mot. for Summ. J. at 1–5) (Page ID #379–83). The district court issued a notice indicating that it intended to resolve the summary-judgment motion without oral argument. *See* R. 37 (Notice at 1) (Page ID #819). After the motion was fully briefed, the district court issued an order granting summary judgment to the Local 25 Funds and finding NCR liable for $1,787,300.75 in unpaid contributions, $143,075.41 in interest, and $288,598.80 in liquidated damages. R. 43 (9/17/2023 D. Ct. Order at 8–10) (Page ID #1351–53). The district court's unpaid contribution award—and therefore the entirety of the monetary damages calculation in this order—was based solely on the Local 25 Funds' audit report. *Id.* at 8–9 (Page ID #1351–52). The district court entered judgment, R. 44 (J. at 1) (Page ID #1357), and NCR filed a notice of appeal, R. 46 (Notice of Appeal at 2) (Page ID #1362).

The Local 25 Funds then filed a motion for attorney fees and costs in the district court. *See* R. 48 (Mot. to Am. J. at iii) (Page ID #1367). The magistrate judge recommended that the district court grant the motion in part, R. 51 (Rep. & Rec. at 14) (Page ID #1508), and the district judge adopted the recommendation, awarding the Local 25 Funds $18,233.15 in costs and $99,812.25 in attorney fees, R. 52 (12/20/2023 D. Ct. Order at 1–2) (Page ID #1510–11). The district court entered an amended judgment that included attorney fees and costs. R. 53 (Am. J. at 1) (Page ID #1512). NCR filed a second notice of appeal. R. 54 (Notice of Appeal at 2) (Page ID #1515). This court consolidated the appellate dockets. D. 24 (Order at 1).

## II. ANALYSIS

NCR contends that the district court erred in three ways: (1) the district court applied an incorrect summary-judgment standard, D. 18 (Appellant Br. at 21–28); (2) the district court erroneously determined that there were no genuine issues of material fact as to damages, *id.* at 29–36; and (3) the district abused its discretion by declining to grant NCR's requested equitable relief, *id.* at 36–44.

Nos. 23-1919/
24-1046

*Trustees of the
Iron Workers Defined Contribution Pension Fund, et al. v.
Next Century Rebar, LLC*

Page 8

We review de novo a district court's grant of summary judgment and a "district court's interpretation of the contractual agreements between the parties." *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 560–61 (6th Cir. 2015). The district court's decision to decline to award equitable relief is reviewed for abuse of discretion. *Liberty Life Assurance Co. of Bos. v. Gilbert*, 507 F.3d 952, 959 (6th Cir. 2007). Abuse of discretion occurs when the "district court committed 'a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact.'" *ACLU v. McCreary County*, 607 F.3d 439, 450 (6th Cir. 2010) (quoting *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 623 (6th Cir. 2008)).

## A. The Summary-Judgment Standard

NCR first contends that the district court failed to apply the more rigorous summary-judgment standard that governs when the movant bears the burden of proof at trial. D. 18 (Appellant Br. at 21–28). "[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020). This is because at trial a plaintiff typically bears the burden to prove each element, whereas a defendant need only "disprove" one element for the plaintiff's claim to fail. *See* 10A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2727.1 (4th ed. 2016).

"[W]here the moving party has the burden [of proof] . . . his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis omitted) (quotations omitted); *see also* 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.40(1)(c) (3d ed. 2010) ("When the movant bears the burden of persuasion at trial, the movant must produce evidence that would conclusively support its right to a judgment after trial should the nonmovant fail to rebut the evidence."). But "[w]hen the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial," which can be done by identifying the absence of evidence. *Calderone*, 799 F.2d at 258–59 (quotations omitted). Put differently, when the moving party bears the burden of proof, their

Nos. 23-1919/            *Trustees of the*            Page 9
24-1046     *Iron Workers Defined Contribution Pension Fund, et al. v.*
*Next Century Rebar, LLC*

"initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (quotations omitted)).

The district court did not cite the above-quoted language that is specific to a summary-judgment movant who bears the burden of proof at trial. *See* D. 43 (09/17/2023 D. Ct. Op. at 5) (Page ID #1348). But even if the district court cited the incorrect standard—by identifying the standard applicable to movants who do not bear the burden of proof—it is not clear that the district court *applied* the incorrect standard. For example, the court determined that the Local 25 Funds "suppl[ied] evidence to support" its damages calculation in the form of the audit and a declaration from the auditor. *Id.* at 9 & n.3 (Page ID #1352). The district court's reasoning is at least consistent with the requirement that the Local 25 Funds must meet a "higher" summary-judgment burden by "show[ing] that the record contains evidence satisfying the burden of persuasion." *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (quoting *Cockrel*, 270 F.3d at 1056).

Even if the district court had applied the wrong standard, however, we decline to resolve the appeal on that basis. "Because we review de novo the grant of summary judgment and the parties have briefed the underlying issues, we will squarely address the merits of this case, rather than" reversing based on the purported use of an incorrect summary-judgment standard. *Pearce v. Chrysler Grp. LLC Pension Plan*, 893 F.3d 339, 346 (6th Cir. 2018).

## B. The ERISA Claim

On appeal, the parties do not dispute the district court's liability ruling; instead, the parties focus on the damages calculation. *See* D. 18 (Appellant Br. at 29–36); D. 20 (Appellee Br. at 17–30); D. 23 (Reply Br. at 2–9). NCR raises two arguments contesting the calculation supporting the damages award. First, NCR argues that the Local 25 Funds used the wrong wage rate, specifically by using the higher rates from Local 416 and Local 846—the rates that the out-of-state employees were actually paid for the Michigan Project work—rather than the Local 25

Nos. 23-1919/
24-1046

*Trustees of the
Iron Workers Defined Contribution Pension Fund, et al. v.
Next Century Rebar, LLC*

Page 10

base rates reflected in the Local 25 Rate Schedules.  D. 18 (Appellant Br. at 30–34).  Second, NCR contends that the audit should have accounted for the benefit contributions that NCR made to the out-of-state funds, which, in NCR's view, conflicts with the plain language of the Local 25 CBA and the International Agreement.  *Id.* at 34–36.

Both arguments require interpretation of the governing agreements.  Contracts establishing an employee benefit plan must, among other things, "specify the basis on which payments are made to and from the plan," 29 U.S.C. § 1102(b)(4), and "[t]he plan administrator is obliged to act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with'" ERISA, *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009) (quoting 29 U.S.C. § 1104(a)(1)(D)).  "Collective bargaining agreements that establish ERISA plans are interpreted by use of ordinary contract principles to the extent those principles are not inconsistent with federal labor policy."  *Operating Eng'rs Local 324 Health Care Plan v. G&W Constr. Co.*, 783 F.3d 1045, 1051 (6th Cir. 2015)).  "When the terms of an ERISA plan are undefined, traditional principles of contract interpretation require a plan administrator to 'interpret the provisions [of the plan] according to their plain meaning in an ordinary and popular sense.'"  *Adams v. Anheuser-Busch Cos.*, 758 F.3d 743, 748 (6th Cir. 2014) (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 711 (6th Cir. 2000)).

If "a contract is in writing and its terms are clear and unambiguous, we ascertain the contract's meaning in accordance with the contract's plainly expressed intent."  *Orrand*, 794 F.3d at 562.  "Where a contractual provision 'is subject to two reasonable interpretations,' however, that provision is deemed ambiguous, and the court may look to extrinsic evidence" of the contracting parties' intent in order to construe the ambiguous provision.  *FDIC v. AmTrust Fin. Corp.* (*In re AmTrust Fin. Corp.*), 694 F.3d 741, 750 (6th Cir. 2012) (quoting *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994)).  The fact that parties propose competing interpretations of language in a plan "does not dictate a finding that the provision is ambiguous."  *Shelby Cnty. Health Care Corp. v. Majestic Star Casino LLC Grp. Health Benefit Plan*, 581 F.3d 355, 370 (6th Cir. 2009).  Rather, "the alternative interpretation . . . 'must be a

Nos. 23-1919/
24-1046

*Trustees of the
Iron Workers Defined Contribution Pension Fund, et al. v.
Next Century Rebar, LLC*

Page 11

plausible one.'" *Id.* (quoting *Zirnhelt v. Mich. Consol. Gas Co.*, 526 F.3d 282, 287 (6th Cir. 2008)). If a term of provision is ambiguous, courts "resolv[e] ambiguities in the insured's favor" because doing so aligns "with ERISA's goals 'to promote the interests of employees and their beneficiaries in employee benefit plans,' and 'to protect contractually defined benefits.'" *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 891 (6th Cir. 2020) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)).

### 1. Wage Rates

Although the benefits contributions at issue relate to employees affiliated with Local 416 and Local 846, the parties agree that the relevant governing CBA is the Local 25 CBA. D. 18 (Appellant Br. at 29–34) (relying on the Local 25 CBA); D. 20 (Appellee Br. at 19) ("[I]t is undisputed that the Trustees of the [Local 25] Funds are enforcing the terms of the Local 25 CBA."). This comports with the International Agreement, which states that the employer must "pay the scale of wages and benefits . . . in force and effect in the Local Union in which the Employer is performing or is to perform work." R. 38-4 (Int'l Agreement § 6(A)) (Page ID #903). The International Agreement also explains that employers must "make timely payments into all fringe benefit funds in accordance with the applicable Local Union collective bargaining agreement," which is the "home Local Union of the geographic jurisdiction in which the work is performed." *Id.* § 6(C) (Page ID #904).

Under the Local 25 CBA, there are various funds to which employers are expected to contribute, including a health fund, a pension fund, a training fund, and a vacation fund, among others. *See* R. 38-3 (Local 25 CBA at art. V, §§ 1–6) (Page ID #868–69). Only two of these funds' contributions are computed based on wage rate—the vacation fund and the pension fund—whereas the remaining fund contributions are calculated based on hours worked or hours paid. *See id.* at art. V, §§ 4, 6; *see also* R. 38-18 (Local 25 Rate Schedules at 1) (Page ID #1238). Thus, NCR's challenge to the wage rate used to calculate unpaid contributions relates to the vacation fund and the pension fund only. We address each in turn.

Nos. 23-1919/
24-1046

*Trustees of the
Iron Workers Defined Contribution Pension Fund, et al. v.
Next Century Rebar, LLC*

Page 12

The wage rate that should be used to calculate the unpaid contributions to the vacation fund is the employee's gross wage. The Local 25 CBA states that employers must pay into the vacation fund in "an amount equal to the percentages as outlined in Article III of the Employee's gross earnings before taxes." R. 38-3 (Local 25 CBA at art. V, § 6) (Page ID #869). Under Article III, employers are instructed to request Rate Schedules from the union. *Id.* at art. III (Page ID #867). The Local 25 Rate Schedules for the relevant period indicate that NCR was required to pay 11.83% of an employee's "gross earnings before taxes." *Id.* at art. V, § 6 (Page ID #869); R. 38-18 (Local 25 Rate Schedules at 1) (Page ID #1238). Because the Local 25 CBA does not define "gross earnings before taxes," this court must "interpret [this] provision according to [its] plain meaning in an ordinary and popular sense." *Adams*, 758 F.3d at 748 (quotations omitted). In plain terms, gross earnings refer to earnings that "consist[] of an overall total exclusive of deductions." *Gross*, MERRIAM-WEBSTER, https://perma.cc/2ZBF-BKMU (last visited Aug. 5, 2024); *see also* Will Kenton, *What is Gross Income? Definition, Formula, Calculation, and Example*, INVESTOPEDIA (Mar. 22, 2024), https://perma.cc/D2DJ-5QMT ("Gross income for an individual . . . is an individual's total earnings before taxes or other deductions."). The Local 25 CBA ties the calculation of the vacation fund contribution (based on gross earnings) to the specific employee. R. 38-3 (Local 25 CBA at art. V, § 6) (Page ID #869) ("[A]n amount equal to the percentage[] . . . of *the Employee's* gross earnings before taxes." (emphasis added)). Accordingly, the vacation fund contribution must be made using the specific employee's gross earnings before any deductions. NCR's proposed definition—using the lower Local 25 wages from the Rate Schedules that were not the employee's actual gross wage rate—does not comport with the plain meaning of the Local 25 CBA. *See In re AmTrust Fin. Corp.*, 694 F.3d at 750 ("Where a contract's meaning is clear on its face, that meaning controls.").

The wage rate that should be used to calculate unpaid contributions to the pension fund presents a closer question. The Local 25 CBA instructs employers to pay into the pension fund "an amount equal to the percentages as outlined in Article III." R. 38-3 (Local 25 CBA at art. V, § 4) (Page ID #868). Under Article III, employers are directed to request Rate Schedules from the union. *Id.* at art. III (Page ID #867). The Local 25 Rate Schedules provided for the relevant

Nos. 23-1919/          *Trustees of the*                          Page 13
24-1046     *Iron Workers Defined Contribution Pension Fund, et al. v.*
*Next Century Rebar, LLC*

period indicate that the employer must contribute 60.69% of the employee's "base wage" to the pension fund.  R. 38-18 (Local 25 Rate Schedules at 1) (Page ID #1238).  The Local 25 CBA does not define the term "base wage"; however, the Local 25 Rate Schedule uses a $28.82 wage rate to compute example contributions.  *Id.*

The parties both argue that the plain language of the Local 25 CBA supports their position by adopting competing interpretations of the term "base wage."  The first—invoked by NCR—is that the Local 25 Rate Schedule defines the base wage as a specific amount and the Local 25 CBA integrates this specific amount through the Local 25 Rate Schedules.  *See* R. 38-3 (Local 25 CBA at art. III) (Page ID #867); R. 38-18 (Local 25 Rate Schedules at 1) (Page ID #1238) (including an example calculation using the $28.82 wages and noting "PENSION . . . percentage of **BASE WAGES**.").  Thus, under NCR's interpretation, it was required to contribute to the pension fund 60.69% of the $28.82 wage rate from the example on the Rate Schedules, rather than the higher rates used in the audit report (and actually paid to the employees).  Conversely, the Local 25 Funds contend that "base wage," as it is used in the Local 25 CBA, takes on a commonsense definition, which is a starting wage that an employer "has discretion to pay above."  D. 22 (Appellee Br. at 21–22).  Under this interpretation, the Local 25 CBA cross-references the percentages in the Local 25 Rate Schedules but does not adopt the set "base wage" amount from the examples.  *See* R. 38-3 (Local 25 CBA at art. V, § 4) (Page ID #868) ("For each Employee covered by this Agreement, an Employer shall contribute to the [pension fund] an amount equal to the *percentages* as outlined in Article III." (emphasis added)).  Therefore, in the Local 25 Funds' view, because NCR paid a higher wage to the out-of-state employees, the higher wage should be multiplied by the percentage from the Local 25 Rate Schedule.

Although these competing interpretations both appear plausible based on the Local 25 CBA, the Local 25 Funds' interpretation more faithfully aligns with the plain language of the Local 25 CBA.  Specifically, Article V, § 4 does not indicate that the calculation relies on the *wages* used in the Local 25 Rate Schedules; instead, the Local 25 CBA states only that the contributions should be calculated using "the percentages" in the Local 25 Rate Schedules.  R.

Nos. 23-1919/                    *Trustees of the*                        Page 14
24-1046          *Iron Workers Defined Contribution Pension Fund, et al. v.*
*Next Century Rebar, LLC*

38-3 (Local 25 CBA at art. V, § 4) (Page ID #868).  The Local 25 Rate Schedules instruct that, to calculate vacation contributions, the percentage should be multiplied by the base wage.  *See* R. 38-18 (Local 25 Rate Schedules at 1) (Page ID #1238) (including an example calculation using the $28.82 base wage and noting "PENSION . . . percentage of **BASE WAGES**.").  The Local 25 CBA does not define base wages; however, the ordinary definition of that term is "a rate or amount of pay for a standard work period, job, or position exclusive of additional payments or allowances."  *Base Pay*, MERRIAM-WEBSTER, https://perma.cc/G9JN-PSCC (last visited Aug. 5, 2024); *see also* Julia Kagan, *Base Pay: Definition as Income, and Comparison to Annual Pay*, INVESTOPEDIA (Dec. 8, 2021), https://perma.cc/UZE2-GUL3 ("Base pay is the initial salary paid to an employee, not including any benefits, bonuses, or raises. . . . Base pay does not include all forms of compensation; for instance, shift differential pay, on-call pay, special assignments, and incentive-based pay are typically excluded from base pay.  Generally, an employee's base pay is the minimum amount they should expect to receive during a specified pay period . . . .").

The out-of-state employees were given "a rate . . . of pay for [the] . . . job" when they were hired to work on the Michigan Project.  *Id.*; *see also* R. 38-2 (Grantham Decl. ¶¶ 11–14, 16) (Page ID #849–50).  The rate of pay was not the specific amount used in the Local 25 Rate Schedules; instead, the employees were paid based on their home-union wages.  *See* R. 38-2 (Grantham Decl. ¶ 16) (Page ID #850).  The wages paid during the Michigan Project differed based on the employees' position (journeyman, foreman, etc), shift, *see, e.g.*, R. 38-18 (Local 25 Rate Schedules at 1) (Page ID #1238), and years of experience, *see* R. 38-7 (Reeves Dep. at 46:7–9) (Page ID #1001).  Thus, there is a different "rate or amount of pay" for the work period, *Base Pay*, MERRIAM-WEBSTER, https://perma.cc/G9JN-PSCC (last visited Aug. 5, 2024), and each employee has a different "base pay [that] is the minimum amount they . . . expect[ed] to receive during" the Michigan Project, before any bonuses or other forms of additional compensation, *see* Julia Kagan, *Base Pay: Definition as Income, and Comparison to Annual Pay*, INVESTOPEDIA (Dec. 8, 2021), https://perma.cc/UZE2-GUL3.  The base wages in this context are, therefore, the base rate that each employee was paid for this project, not the minimum wage payable based on the Local 25 Rate Schedules.  Accordingly, pension fund contributions should be calculated using the base rate that the employees were actually paid for the Michigan Project.

Nos. 23-1919/              *Trustees of the*             Page 15
24-1046      *Iron Workers Defined Contribution Pension Fund, et al. v.*
*Next Century Rebar, LLC*

Even if this were not so, and the term "base wage" could be considered ambiguous based on the competing definitions, any ambiguity must be construed in favor of the insured in order "'to promote the interests of employees and their beneficiaries in employee benefit plans,' and 'to protect contractually defined benefits.'" *See Wallace*, 954 F.3d at 891 (quoting *Firestone*, 489 U.S. at 113). Here, construing the term "base wage" in favor of the employees would lead to the same conclusion: the employees are entitled to have NCR contribute based on the higher base wage rate they were actually paid for the Michigan Project because this would maximize the benefits contributions.

Finally, it is not apparent from the record whether the audit used the proper wage rates. Although the Local 25 Funds represented during oral argument that the proper wage rates were used for the audit, *see* Oral Argument at 23:30–24:26, the Local 25 Funds did not identify evidence to support its position and appeared to rely on a misunderstanding of gross wages, and it is not otherwise clear that the record supports the Local 25 Funds' position, *see id.* (Local 25 Funds' lawyer stating that the pension contribution is based on "the wage rate paid per hour" and the vacation contribution is "based . . . on the gross earnings *after taxes*" and explaining that the auditor used these rates to complete the audit (emphasis added)). The record shows that the audit used the wages actually paid to the employees, but it is not clear whether the wages used in the calculation were gross wages for the vacation fund and base wages for the pension fund. *See* R. 36-5 (Reeves Decl. ¶¶ 6–11) (Page ID #429–31); R. 36-9 (Audit at 1–4) (Page ID #546–49) (indicating that the audit used the employees' "wages" but not specifying whether those wages are gross, base, or net). Although it is possible that certain employees' gross and base wages are identical, there is insufficient information in the record before this court for us to conclude that the audit used the proper wage rates. Because the Local 25 Funds, as plaintiffs, moved for summary judgment, they bear the evidentiary burden to show that the audit used the rate required under the Local 25 CBA. *See Cockrel*, 270 F.3d at 1056. This issue, therefore, is a genuine issue of material fact that remains unresolved.

In sum, the Local 25 CBA required the Fund to calculate benefits using distinct employee wage rates—gross for the vacation fund and base for the pension fund—and, thus, the Local 25

Nos. 23-1919/                                    *Trustees of the*                                    Page 16
24-1046                    *Iron Workers Defined Contribution Pension Fund, et al. v.*
                                        *Next Century Rebar, LLC*

Funds are correct that the audit should use the higher wage rates rather than the example wage rates used on the Local 25 Rate Schedule. Nonetheless, because it is not clear from the record whether the audit correctly used gross and base wage rates for the requisite funds, the Local 25 Funds have not met their burden to show that they are entitled to the unpaid contributions as currently calculated by the audit.

### 2. Payment to Out-of-State Funds

Next, NCR argues that the auditor incorrectly included contributions that it already made to the out-of-state funds, in violation of the International Agreement's prohibition on duplicate contributions. D. 18 (Appellant Br. at 34–36). In response, the Local 25 Funds do not dispute NCR's interpretation of the International Agreement; instead, the Local 25 Funds argue that the contributions it seeks are not duplicates because "NCR has not paid the documented fringe benefit contributions to the [Local 25] Funds in Michigan in the first place" as required by the Local 25 CBA. D. 20 (Appellee Br. at 28–29). The Local 25 Funds also fault NCR for "fail[ing] to identify the amount of credit or setoff it is seeking." *Id.* at 27–28.

The relevant governing contract is unambiguous and bars the Local 25 Funds from collecting the requested duplicate contributions. The International Agreement states, in relevant part, that "[u]nder no circumstances shall there be a request for a payment of double fringe benefit amounts (benefits paid to more than one Local Union's funds) as a result of work performed under this agreement." R. 38-4 (Int'l Agreement § 6(D)) (Page ID #904). The agreement is unequivocal in that there is "no circumstance[]" under which double payment can be requested. *Id.*

Here, NCR made benefits contributions to funds associated with Local 416 and Local 846, and the Local 25 Funds were aware of these contributions. *See* R. 38-2 (Grantham Decl. ¶ 10) (stating that "NCR paid fringe benefit contributions, with the exception of vacation contributions and dobie dues, to . . . Local 846 and Local 416"); R. 38-7 (Reeves Dep. at 31:18–33:11) (Page ID #986–88) (explaining that it appeared to Reeves that NCR was sending benefits contributions to the out-of-state funds). The Local 25 Funds' auditor did not attempt to account

Nos. 23-1919/
24-1046

*Trustees of the
Iron Workers Defined Contribution Pension Fund, et al. v.
Next Century Rebar, LLC*

Page 17

for any payments that NCR made to the out-of-state unions.  *See* R. 38-15 (9/14/2021 Email at 1) (Page ID #1227); R. 38-16 (9/15/2021 Email at 1) (Page ID #1230).

Although "standing alone, an award of benefits causing an employer to double pay 'would not be sufficient to relieve the employer of its contractual obligation to make contributions,'" *Orrand v. Hunt Constr. Grp., Inc.*, 852 F.3d 592, 595 (6th Cir. 2017) (quoting *Trs. of B.A.C. Loc. 32 Ins. Fund v. Ohio Ceiling & Partition Co.*, 48 F. App'x 188, 196–97 (6th Cir. 2002)), here, NCR is not simply arguing that ERISA prevents double payment.  Instead, NCR has identified a controlling contractual provision that *prohibits* double payments *explicitly*. The Local 25 Funds do not contest that this provision exists; instead, they argue that NCR must nonetheless contribute to the Local 25 Funds because, under the Local 25 CBA, NCR should have paid the Local 25 Funds in the first instance.  In other words, the Local 25 Funds have identified a conflict in the governing agreements.  "In situations where" there are "conflicting [governing agreements] that purport to impose a duty to 'double pay' for the same job, the collecting trustee must show that the [governing agreements]" intended to allow for double payment.  *Trs. for Mich. BAC Health Care Fund v. OCP Contractors, Inc.*, 136 F. App'x 849, 851 (6th Cir. 2005) (per curiam).  The Local 25 Funds may be correct that they were entitled to the contributions in the first instance; however, the International Agreement unequivocally states that there are "no circumstances" under which the Local 25 Funds can collect duplicate contributions.  R. 38-4 (Int'l Agreement § 6(D)) (Page ID #904).  NCR has already contributed to the out-of-state funds on behalf of employees that performed work on the Michigan project, and therefore, the Local 25 Funds' request for contributions on behalf of those same employees is duplicative.  Without any suggestion that the governing contracts allow for double payment— and in the face of clear contractual language that prohibits it—the Local 25 Funds cannot request this double payment.  *See Trs. for Mich. BAC Health Care Fund*, 136 F. App'x at 851. Accordingly, the Local 25 Funds' audit includes contributions to which the Local 25 Funds are not entitled under the International Agreement.

In light of this, the Local 25 Funds' argument that NCR failed to provide evidence of the amount it paid to out-of-state unions inappropriately shifts the burden of proof at summary

Nos. 23-1919/         *Trustees of the*         Page 18
24-1046     *Iron Workers Defined Contribution Pension Fund, et al. v.*
*Next Century Rebar, LLC*

judgment.[7]  The Local 25 Funds bear the burden of proving that they are entitled to the amount of damages that they seek and, at this stage, to preclude summary judgment, NCR need only identify a question of fact concerning the calculation of damages such that a reasonable juror may not award the Local 25 Funds the full requested amount.  For the reasons explained above, the Local 25 Funds' unpaid-contribution estimate is legally inaccurate and there is insufficient evidence in the record to support an accurate estimate that does not include duplicative contributions.  Therefore, the Local 25 Funds have not shown that they are entitled as a matter of law to the requested sum of unpaid contributions, and the Local 25 Funds are not entitled to summary judgment as to damages.[8]

## C.  Equitable Relief

Finally, NCR argues that the district court abused its discretion because it "imposed a de facto prior-case requirement," "failed to examine the facts or balance the equities," and incorrectly stated "that NCR could recover the amount of its judgment from the out-of-state funds."  D. 23 (Reply Br. at 15–16); *see also* D. 18 (Appellant Br. at 36–44).  Employers are restricted in the defenses that they may raise when they are sued to collect unpaid contributions to ERISA funds.  Nonetheless, "[c]ourts generally permit a few defenses, including illegality of the contributions, the contract requiring the contributions was void at its inception, or the union was decertified."  *Operating Eng'rs Loc. 324 Health Care Plan*, 783 F.3d at 1052.  These permissible defenses "render irrelevant the oral statements or conduct of the Union in a collection action."  *Id.* at 1053.

---

[7]Even if NCR were required to produce evidence of the specific amounts contributed to Local 416 and Local 846, such evidence is in the record.  *See* R. 36-16 (Local 416 Contr. at 1) (Page ID #634) (indicating that NCR owed $104,002.56 in contributions to Local 416 for February 2021); R. 36-18 (Local 416 Discrepancy Rep. at 1) (Page ID #660) (depicting $154,106.16 in contributions owed by NCR to Local 416); R. 38-2 (Grantham Decl. ¶ 10) (stating that "NCR paid fringe benefit contributions, with the exception of vacation contribution and dobie dues, to . . . Local 846 and Local 416").  Although these records are incomplete, they are sufficient factually to substantiate NCR's claim that the audit is inaccurate.

[8]Because the Local 25 Funds have not met their burden as to unpaid contributions, they necessarily have not met their burden to prove interest and liquidated damages, which are calculated using the amount of unpaid contributions.  *See* 29 U.S.C. § 1132(g)(2).  No party contests the amount of attorney fees or costs, and, therefore, we do not address those awards.  The district court on remand may reconsider those amounts as appropriate.

Nos. 23-1919/                    *Trustees of the*                    Page 19
24-1046          *Iron Workers Defined Contribution Pension Fund, et al. v.*
                              *Next Century Rebar, LLC*

ERISA also allows for unjust-enrichment claims.  Generally, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."  *Whitworth Bros. Storage Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, 794 F.2d 221, 225 (6th Cir. 1986) (emphasis omitted) (quoting 29 U.S.C. § 1103(c)(1)).  If, however, an employers' contribution was made "by a mistake of fact or law," section 1103(c)(1) "shall not prohibit the return of such contribution" to the employer.  *Id.* at 225 (quoting 29 U.S.C. § 1103(c)(2)(A)(ii)).  This provision has been interpreted to allow employers to bring unjust-enrichment claims.  *See id.* at 231, 235–36 & nn.23–24 (explaining that "[a]n action for unjust enrichment, equitable in nature, and developed in light of the policies of ERISA is appropriate" in part because ERISA "evinces congressional intent not to completely preclude employer recovery of mistakenly paid contributions").  Any unjust-enrichment claim is "limited by the terms of ERISA . . . and by the terms of the agreement between the parties" and, at times, may mean that mistaken payments are not refunded because "Congress, in weighing the interests implicated in the context of employee benefit plans, has favored the financial soundness of the plan and held employers to high standards of accounting."  *Id.* at 236 n.24.

Here, the district court did not abuse its discretion.  First, the district court did not—as NCR contends—apply "a de facto prior-case requirement."  D. 23 (Reply Br. at 15).  Instead, the district court addressed the arguments that NCR made in its briefing.  R. 43 (09/17/2023 D. Ct. Op. at 11–12) (Page ID #1354–55).  NCR had relied principally on out-of-circuit cases—because it was requesting equitable relief in a circumstance that this circuit has not yet addressed—and the district court determined that the primary case that NCR provided was not analogous.  *See* R. 38 (Opp'n at 18–19) (Page ID #842–44).  Specifically, the district court explained that *Coar v. Kazimir*, 990 F.2d 1413 (3d Cir. 1993), was inapposite.  *See* R. 43 (09/17/2023 D. Ct. Op. at 11–12) (Page ID #1354–55).  In *Coar*, the Third Circuit found that the plaintiff-employee was entitled to his unpaid *benefits* that the Fund had withheld in order to pay a civil judgment related to "kickbacks" that were made using fund assets because "permitting the set-off in this case best implements Congress's purpose to *guarantee pension beneficiaries the broadest protection possible against fiduciaries who breach their fiduciary duties* to a pension fund and thereby

Nos. 23-1919/         *Trustees of the*                                    Page 20
24-1046          *Iron Workers Defined Contribution Pension Fund, et al. v.*
                         *Next Century Rebar, LLC*

cause it losses." 990 F.2d at 1414–15, 1424 (emphasis added). In reviewing *Coar*, the district court did not state that a prior case was required; instead, it simply found that the cases NCR invoked did not support its argument. This was not an abuse of discretion because *Coar* did not involve unpaid contributions by an employer into a fund, but instead addressed a beneficiaries' entitlement to benefits when a fund breached its fiduciary duties.

NCR's second and third arguments—that the district court failed to weigh the equities and incorrectly determined that NCR had a viable unjust-enrichment claim against Local 416 and Local 846—are interrelated. The district court explained that NCR's arguments on these points "lack[ed] merit" because "the factual scenarios in the cases [NCR] relie[d] upon [were] not analogous to the facts of this case" and NCR could get its requested equitable relief by "pursu[ing] a claim of unjust enrichment, or similar, against Local 846 or Local 416 funds." R. 43 (09/17/2023 D. Ct. Op. at 11–12) (Page ID #1354–55). The district court correctly concluded that NCR's setoff request was directed at the wrong fund. NCR's "mistaken payments" were not to the Local 25 Funds that are party to this case; the contributions were mistakenly made to Local 846 and Local 416. NCR's request for equitable relief is more appropriately directed to the out-of-state unions' funds.[9] At bottom, NCR disagrees with the manner in which the district court weighed the equities in this case. Such a contention does not amount to an abuse of discretion.

---

[9]NCR's view that it no longer has a viable unjust-enrichment claim is based on its interpretation of the out-of-state union CBAs, which provide a limited period under which NCR was required to request a return of mistaken contributions made to the out-of-state funds. *See* D. 18 (Appellant Br. at 36–44). NCR has not provided a reason as to why it could not bring a lawsuit despite failing to use the contractual remedies, particularly when NCR arguably could not comply with the contractual time limits due to the Local 25 Funds' actions—as opposed to NCR's own negligence.

Even if NCR were no longer able to bring an unjust-enrichment suit against the out-of-state funds, NCR has not provided a reason why the Local 25 Funds should be responsible for bearing the harm of the mistaken payments. *See Whitworth*, 794 F.2d at 236 & n.24 ("Congress, in weighing the interests implicated in the context of employee benefit plans, has favored the financial soundness of the plan and held employers to high standards of accounting.").

Nos. 23-1919/
24-1046

*Trustees of the*
*Iron Workers Defined Contribution Pension Fund, et al. v.*
*Next Century Rebar, LLC*

Page 21

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM in part** and **REVERSE in part** and **REMAND** the case for further proceedings.